Filed 5/14/13  G.M. v. Super. Ct. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| G.M. et. al., | |
| Petitioners, | E058010 |
| v. | (Super.Ct.No. J246536) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petitions for extraordinary writ.  Gregory S. Tavill, Judge.  Petitions denied.

Gloria Gebbie, for Petitioner G.M.

Terrence F. Riley, for Petitioner N.C.

No appearance for Respondent.

1

Jean-Rene Basle, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Real Party in Interest.

Petitioners G.M. (father) and N.C. (mother) filed separate petitions for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's order denying reunification services as to their son, E.M. (the child), and setting a Welfare and Institutions Code[1] section 366.26 hearing. Father and mother (the parents) argue that there was insufficient evidence to support a finding that they abused the child, and that the juvenile court erred in denying them reunification services under section 361.5, subdivisions (b)(5). We deny the writ petitions.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 25, 2012, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was one month old at the time. The petition alleged that the child came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (e) (serious physical abuse). Specifically, the petition alleged that the child sustained multiple fractures while in the care and custody of the parents.[2] The court detained the child and maintained him with the paternal grandmother.

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] Father was mother's boyfriend.

2

*Jurisdiction*

The social worker filed a jurisdiction report on November 14, 2012, and recommended that the court sustain the petition, and that no reunification services be provided to the parents. The social worker reported that on October 16, 2012, the parents brought the child to Pomona Valley Medical Center (the medical center) for a leg injury. Medical personnel determined that the child had sustained a spiral fracture to his left femur. The social worker interviewed the parents at the hospital, and they could not provide an explanation for the injury. Mother had noticed that morning that the child would not stop crying, and that he was moving his left leg less than his right. She denied that he had fallen, and she stated that she and father were the only people who cared for the child. Father denied having any knowledge of how the child sustained the injury. He only stated that he had rolled onto the child in the early hours of October 15, 2012, but did not think the child was injured, since the child just cried a little and went back to sleep.

The social worker spoke with the emergency room doctor at the medical center, and he said that the father's explanation of rolling onto the child was unlikely to have caused the fracture to the femur. The doctor suspected abuse. X-rays taken at the hospital were later reviewed by Dr. Mark Massi at the Children's Assessment Center. Dr. Massi said the child's leg fracture would not have been caused by father rolling onto the child on a soft mattress. Dr. Massi also reported that there was likely a second fracture to the left humerus (arm), which appeared to be older than the leg fracture, since it was in the healing stages. The medical center later confirmed the arm fracture.

3

The social worker reported that the child was then transferred to Loma Linda University Children's Hospital (Loma Linda), where a full skeletal survey was done. In addition to the femur fracture, there was a fracture to the right tibia bone just below the knee, and there was suspicion of a left tibia (shin bone) fracture near the ankle.

On October 19, 2012, Dr. Massi performed a suspected child abuse and neglect examination. He concluded that the child sustained a femur fracture and probable tibia fracture, and that these fractures were "most likely inflicted and constitute[d] evidence of physical abuse."

On October 30, 2012, the parents told the social worker that they were surprised that multiple fractures were found. They maintained that they did not know how their son sustained the fractures. Mother said the only way he could possibly have sustained them was by father accidentally rolling onto the child, or the child being injured during diaper changes. Father reported that the child was possibly injured while being put in his car seat. At both hospitals, the parents were told that the reasons they gave for the injuries were not plausible causes for the fractures.

On October 31, 2012, November 1, 2012, and November 2, 2012, the social worker asked the parents separately and together about the child's injuries. They maintained that they had no idea how the child sustained multiple fractures. Mother said that she and father lived with her parents (the maternal grandparents). Mother stated that she was the primary caregiver, as she cared for the child everyday and only left him alone with the maternal grandparents on Monday nights so she could attend college classes. Father reported that he worked full-time, and that mother was always with the child.

4

Father cared for the child when he returned from work. Both parents stated that they did not abuse their son, and they did not believe that anyone else could have caused harm to the child.

The social worker interviewed the maternal grandparents. They said they did not know how the child sustained the injuries and offered the same explanations as the parents did. The paternal grandparents were interviewed and also said they did not know anything.

The social worker further reported that on November 2, 2012, Dr. Massi called to inform her that a second bone survey was performed on the child at Loma Linda the day before. This bone survey showed that the child had a fracture of the right tibia, an oblique (not spiral) fracture of the femur, an oblique fracture of the left humerus, and a left posterior sixth rib fracture. According to medical personnel at both Loma Linda and the medical center, the injuries that the child sustained were nonaccidental and were suspected to be child abuse. The parents were informed of the results of the second bone survey, and asked again if they knew how their son sustained the injuries. They said they did not know, and that they would never do anything to intentionally harm their son.

The social worker spoke with Dr. Massi again on November 8, 2012, and he confirmed that the child had four fractures, including the left and right tibia, an oblique left femur, and a rib. Dr. Massi stated that the injuries were nonaccidental and were consistent with child abuse, and that they were caused by an excessive amount of force.

The social worker explained to the parents that they were responsible for the child's injuries, either by them personally injuring him or by failing to protect him. They

5

both stated that if they caused harm to the child, it was accidental and not out of malice. They said they were willing to do whatever was necessary to reunify with the child. The social worker opined that the parents could not benefit from services if neither of them could acknowledge or take responsibility for the child's injuries.

At the jurisdiction hearing on November 15, 2012, the parents set the matter contested, and the hearing was continued to January 3, 2013.

Subsequently, two psychological evaluations were submitted to the court. The first concerned an evaluation of father by Dr. John Kinsman. Father responded defensively throughout the evaluation, but he showed no signs of psychological or cognitive impairment. Dr. Kinsman opined that father was "likely to manifest narcissistic-like tendencies," and that he could become preoccupied with his own needs at the expense of others. Dr. Kinsman concluded that father could benefit from "services designed to improve his functional level, interpersonal effectiveness, and parenting ability." The second report was submitted by Dr. Robert Suiter regarding mother. Mother was 19 years old, worked part-time, and was going to college. Dr. Suiter stated that there was no indication of psychopathology or any significant personality traits. Mother stated that her pregnancy was planned, and that she and father were happy to have a child. Dr. Suiter concluded that the results of his testing were not consistent with an individual who would be predisposed to abusing her child. Rather, the results were consistent with an individual who was emotionally healthy, satisfied with herself and her situation, and unlikely to become unduly angry or hostile.

A contested jurisdictional hearing was held on January 31, 2013. Dr. Kinsman testified that after conducting father's evaluation, his conclusion was that father "could probably benefit from reunification services." However, Dr. Kinsman said he could not give a definitive answer on whether the provision of services would be likely to prevent reoffense.

Father also testified at the hearing and said that whenever he was with the child at home, mother was in the house. When asked about rolling over the child in bed, father said that that was just a possibility; however, he did not know for a fact that he had rolled over the child. Father denied ever telling the social worker that the child could have gotten hurt in a car seat. He said there were two other possibilities as to when the child could have been injured, including when he would sit with the child and bounce him up and down, and when he would change the child's diaper. However, father testified that he never bounced the child too roughly, and that he never inadvertently bent the child's leg back while changing his diaper. Father further testified that he never asked mother or the maternal grandparents whether they hurt the child. Father testified that he was aware that the medical personnel at Loma Linda and the medical center indicated that the child's fractures were sustained by physical abuse. Nonetheless, he believed that the fractures were all accidental. He believed they were accidental because "none of us did anything on purpose to harm that child."

Mother also testified at the hearing and confirmed that she was the primary caregiver. She testified that on October 15, 2012, father changed the child's diaper at around noon and noticed that the child's leg was not moving. She was present and said

7

she did not know why it would not be moving. Mother also noticed that the child began crying in a high-pitched scream around noon, and that he sounded like he was in pain. They continued to observe the child and took him to the hospital the next day. Mother testified that on the morning father noticed the leg injury, she and father were taking care of the child, and that the day before that, she and her mother took care of the child. However, mother never left the child alone with anyone during that time. Mother testified that she did not physically harm the child, and she did not believe that anyone physically abused the child. She had no explanation for how the child sustained the injuries. She thought that it was possible that the doctors at the medical center and Loma Linda may have caused some of the fractures.

Dr. Suiter testified about his psychological evaluation of mother. He opined that, if the court found that mother abused the child, reunification services would be likely to prevent reabuse. He explained that services would teach her to improve her parenting skills which would, in turn, reduce her frustration and angry responses with children. Then, when the court asked whether he believed mother could benefit from services without ever having acknowledged that the child was abused, Dr. Suiter said she could receive some benefit, but he could not say that she would never reoffend. He explained that the benefit of services would be in reducing the risk.

After hearing all the testimonies and considering the evidence, the court noted that both parents essentially gave "the exact same answer that nobody harmed the child on purpose." The court said it was waiting to hear their explanation of how they harmed the child on accident, but that explanation never came. The court concluded the following:

8

". . . [T]here really is not a lot of controversy in the evidence. It's clear to the Court that the child was abused by the parents on the morning of October the 15th. [¶] And I say, 'by the parents,' because it's clear to the Court that they were both present. And while it's in a sense problematic that neither one of them is willing to tell the truth about what transpired, it really leads to the one conclusion that they both did it, and they both participated, and they were both present. That's the only conclusion that I can come to based on the evidence. [¶] And . . . the medical evidence is clear, about the broken femur, in that that has to be the product of abuse. [¶] And I'm trying to reconcile why, like I said, both parents are saying the same thing and sticking together united. And the only thing I can conclude is they were either doing it together or the other one was present, or maybe it was—and I think this is likely, that there maybe was more than one incident because of the multiple breaks." The court found father to be the presumed father of the child. It then found that the child came within section 300, subdivisions (a), (b), and (e), and adjudged him a dependent of the court. The court denied reunification services since the child had been brought within the jurisdiction of the court under section 300, subdivision (e). The court set a section 366.26 hearing for June 5, 2013.

## ANALYSIS

### I. The Court Properly Found That the Child Came Within Section 300, Subdivision (e)

Father argues that there was no substantial evidence to support the court's finding that he abused the child. Mother begins her argument by asserting that "[i]t is not disputed that the court correctly determined that [the child] fell within the provision of" section 300, subdivision (e). However, we note that she ends her argument by stating that

9

there was insufficient evidence to prove that she injured the child. We conclude that the court properly found that the child came within section 300, subdivision (e).

A. *Standard of Review*

Section 300, subdivision (e), provides that the court has jurisdiction where "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." To establish jurisdiction under this subdivision, CFS must show that: "(1) there is a minor under the age of five; (2) who has suffered severe physical abuse as defined in section 300, subdivision (e); (3) by a parent or any person known to the parent if the parent knew or reasonably should have known that the person was physically abusing the minor. [Citation.]" (*In re E.H*. (2003) 108 Cal.App.4th 659, 668 (*E.H*.).)

In evaluating whether a child comes under section 300, subdivision (e), "we use the substantial evidence standard of review, where we determine whether evidence that is of reasonable, credible and solid value supports the dependency court's findings. We do not reweigh the evidence, nor do we consider matters of credibility. [Citation.]" (*E.H., supra*, 108 Cal.App.4th at p. 669.)

B. *The Court Made a Proper Finding Under Section 300, Subdivision (e)*

Father asserts that the court "relied heavily if not completely on the denial of culpability by the parents to sustain the allegation" under section 300, subdivision (e), as to both of them. He contends that such denial was insufficient evidence to prove that he injured the child.

10

The case of *E.H.*, *supra*, 108 Cal.App.4th 659 is instructive.  In that case, the minor lived with her mother and her mother's family.  (*Id*. at p. 662.)  The minor was hospitalized with multiple rib fractures, fractures of the wrist, femur, feet, hands, and hip.  The fractures were at different stages of healing.  (*Id*. at p. 661.)  Neither the mother nor the father, who did not live with them, had any explanation for how the minor was injured.  (*Id*. at p. 662.)  Only the parents and mother's family took care of the minor.  (*Id.* at p. 665.)  Medical personnel concluded that the minor's injuries were the result of child abuse.  (*Id.* at p. 663.)  The lower court dismissed an allegation made under section 300, subdivision (e) because there was no identified perpetrator.  (*Id*. at p. 667.)  However, the appellate court reversed, noting that the Department essentially employed a "res ipsa loquitur" type of argument to support a jurisdictional finding under section 300, subdivision (e).  (*Id*. at p. 669.)  The appellate court noted that there was severe physical abuse (the minor's broken bones) and that the minor was never out of her parents' custody.  (*Id*. at pp. 669-670.)  The court found that "[t]he only reasonable conclusion to be drawn from the facts of the instant case was that someone in the home was causing [the minor's] injuries, and that [the parents] *reasonably* should have known (since they lived there) the identity of the perpetrator."  (*Id*. at p. 670.)  The court specifically stated that "where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out.  A finding may be supported by *circumstantial evidence* as it is here.  Otherwise, a family could stonewall the Department and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under subdivision (e)."  (*Ibid*., italics added.)

11

In the instant case, father argues that the court relied on the denial of culpability by the parents to sustain the allegation under section 300, subdivision (e), and that this was insufficient evidence to prove that he injured the child. However, the court did not rely on their denial, but rather properly found that the child came within its jurisdiction by the circumstantial evidence in this case. Mother testified that she and father were the only ones caring for the child on the day father noticed the child's leg injury, and that she and her mother took care of the child the day before that. Mother said she never left the child alone with anyone during that time. She was the primary caretaker of the child, yet neither she nor father could explain how the child sustained his injuries. The doctors opined that the child's injuries were nonaccidental and were the result of abuse. Based on the evidence before it, the only reasonable conclusion that the court could come to was that mother, father, or both of them caused the child's injuries, or, they reasonably should have known who caused the child's injuries. (*E.H.*, *supra*, 108 Cal.App.4th at p. 670.)

Therefore, the court properly found that the child came within section 300, subdivision (e).

## II. The Court Properly Denied Reunification Services

The parents argue that the court erred in denying reunification services under section 361.5, subdivision (b)(5). Father contends that the court was concerned "with only one factor"—the identification of the perpetrator. They both argue that the court only considered the fact that they denied hurting the child, without considering the evidence, such as the psychological evaluations, showing they would benefit from reunification services. We conclude that the court properly denied services.

12

A. *Standard of Review*

"We affirm an order denying reunification services if the order is supported by substantial evidence. [Citation.]" (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "We do not reweigh the evidence, nor do we consider matters of credibility." (*E.H.*, *supra*, 108 Cal.App.4th at p. 669.)

B. *There Was Sufficient Evidence to Deny Services*

"In enacting subdivision (b) of section 361.5, the Legislature has recognized that under some circumstances it may be futile to offer a parent reunification services. [Citation.]" (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 20 (*Kenneth M.*).) Section 361.5, subdivision (b) provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (5) That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian." Section 300, subdivision (e), and section 361.5, subdivision (b)(5), do not require identification of the perpetrator. (*Kenneth M.*, at p. 21.) "Read together, those provisions permit denial of reunification services to either parent on a showing that a parent or someone known by the parent physically abused a minor." [Citation.] Thus, 'conduct' as it is used in section 361.5, subdivision (b)(5) refers to the

13

parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*Ibid*.)

In order to deny reunification services to the parents under section 361.5, subdivision (b)(5), the threshold issue is whether the child fell within section 300, subdivision (e). As discussed *ante*, the child was never out of his parents' custody; therefore, the court found that the parents inflicted the abuse or reasonably should have known someone else was inflicting abuse on their child. (§ 300, subd. (e); see *ante*, § I.)

The parents argue that the court did not give appropriate consideration to the evidence of the psychological evaluations indicating that they would benefit from reunification services. However, once a child falls within section 300, subdivision (e), "the court shall not order reunification in any situation described in paragraph (5) of subdivision (b) *unless* it finds that, based on competent testimony, those services are *likely to prevent reabuse . . . .*" (§ 361.5, subd. (c), italics added.) Thus, the question was not whether the parents "would benefit from" or were "amenable to" reunification services, as the parents posit. Rather, the question was whether services were likely to prevent reabuse. The parents presented evidence from psychologists that they could benefit from services. However, the court properly noted that it had to find that services would be likely to prevent reabuse and concluded that such evidence was not before the court. The court further found that services would *not* prevent reabuse, citing the "united deception of the parents regarding what happened to [the] child." The court had earlier expressed its doubts that services would prevent reabuse if a person never acknowledged how the child was hurt, or that he or she was responsible for the injuries. Given that both

14

parents continually denied the injuries were the result of child abuse, despite the medical evidence to the contrary and their lack of a plausible explanation for the injuries, we conclude that the court properly denied services under section 361.5, subdivision (b)(5).

Both parents rely on *L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285 (*L.Z.*), and contend that the court denied services simply because they denied hurting the child and/or no one admitted abusing the child. However, *L.Z.* is distinguishable. In that case, a baby was living with her parents and her maternal grandmother when she sustained terrible injuries. (*Id*. at p. 1288.) Both parents could not explain the injuries. (*Id*. at pp. 1288-1289.) The trial court denied services, stating that either parent could have caused the injuries, that neither of them acknowledged responsibility, and that until one of them did, the court could not be sure abuse would not occur again. (*Id*. at p. 1291.) However, the appellate court concluded that there was no evidence that the mother or grandmother abused the child, and all the evidence pointed to the father. (*Id.* at p. 1292.) Furthermore, the evidence did not show that the mother knew or should have known that the baby had been abused. (*Id*. at p. 1293.) The appellate court noted that the lower court was "focused on securing the perpetrator's admission of guilt rather than ascertaining the legal measure of Mother's conduct required by section 300, subdivision (e)." (*Id*. at p. 1293.) The appellate court held that "the court should not require one parent to admit to physically abusing the baby in order for the other parent to be eligible for reunification services." (*Id.* at pp. 1293-1294.)

Unlike *L.Z.*, *supra*, 188 Cal.App.4th 1285, the lower court here was not solely focused on securing the perpetrator's admission. Furthermore, contrary to the parents'

15

apparent contention, the court here did not deny both of them services simply because no one would admit to abusing the child. The evidence showed that the child had been abused, and the evidence pointed to the parents either causing the child's injuries or knowing who caused the injuries, since the injuries occurred while the child was in their custody. Although the court found it "problematic" that neither of them was willing to tell the truth about what happened, the court concluded, based on the evidence before it, that both parents were responsible.

Viewing the evidence in the light most favorable to the order, we conclude that the court properly denied the parents reunification services under section 361.5, subdivision (b)(5).

DISPOSITION

The writ petitions are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST<br>Acting P. J.

We concur:

McKINSTER
               J.

MILLER
               J.