133 Cal.Rptr.2d 740 (2003)
108 Cal.App.4th 659
In re E.H., et al., Persons Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Appellant,
v.
Tiffany M., et al., Respondents.
No. B158662.
Court of Appeal, Second District, Division Seven.
April 28, 2003.
Review Denied July 16, 2003.[*]
*741 Lloyd W. Pellman, County Counsel, Pamela S. Landeros, Deputy County Counsel for Appellant Los Angeles County Department of Children and Family Services.
Steven D. Schatz, under appointment by the Court of Appeal, Santa Ana, for Jeremy H.
Jesse F. Rodriguez, under appointment by the Court of Appeal, Marina Del Rey, for Tiffany M.
Janette Freeman Cochran, under appointment by the Court of Appeal, Pasadena, for E.H. and D.H.
MUÑOZ, J.[**]
The Los Angeles County Department of Children and Family Services (Department) appeals an order finding that Tiffany M.'s infant daughter, E. H., was not described by Welfare and Institutions Code[1] section 300, subdivision (e),[2] because the identity of the person who caused her injuries (numerous broken bones) could not be established as required by the statute. The dependency court sustained allegations under section 300, subdivisions (a), (b), (j). On appeal, *742 the Department argues that the language of subdivision (e) only requires that the identity of the person need be known where it is someone other than the child's parent who is the abuser.[3]

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Tiffany is the mother of E., born in June 2001. On September 14, 2001, E. was taken to the doctor with a swollen right thigh. E. was hospitalized with multiple rib fractures, fractures of the wrist, femur, feet, hands, and hip. The fractures were at different stages of healing and ranged from one to six weeks old. On September 20, 2001, the Department filed a Welfare and Institutions Code section 300 petition, alleging serious physical harm, failure to protect, severe physical abuse of a child under five, cruelty, and abuse of sibling. (§ 300, subds.(a), (b), (e), (i) and (j).) E. was put on "hospital hold" and her sister D., born in July 2000, was detained and placed in foster care.
E. was examined by Dr. Brooke La Duca, who found E. had mild osteopenia, which is a slight lack of bone density. However, this condition would not have caused E.'s many fractures, which were likely non-accidental. E. did not appear to have osteogenesis imperfecta or any other bone disease that would have resulted in her injuries. Even with bone breaks, babies do not always show bruising. Genetic testing would need to be conducted to determine whether E. had osteogenesis imperfecta. E. did have "closed lip schizencephaly," which was unrelated to child abuse, and meant that E. will likely be retarded and will need special care.
At the hospital, Tiffany was interviewed. Tiffany, who is 19, and E.'s father, Jeremy M., are not married. Tiffany attends school Mondays through Thursdays. Tiffany was living with her mother, older brother Raymond (22 years old), and her sisters Michelle and Monique (18 years old). Jeremy, who is 18, lives with his mother. Monique has cerebral palsy, is blind in one eye, and cannot walk. She crawls around the apartment. Raymond does not like holding babies. When Tiffany is not at home, whoever is around takes care of the children. Tiffany told Cynthia Twiss, the case social worker (CSW) that "nobody in the family would hurt my kids," and "there is no way that anyone else comes to my house and hurts my kids." Tiffany denied that anyone in her home could have caused E.'s injuries.
When questioned by the CSW concerning where she and her children slept, Tiffany stated that she shares a bedroom with a bunk bed with her sisters, and E. sleeps on the floor. The CSW questioned whether one of her sisters could have rolled on the baby or the sister with cerebral palsy could have accidentally crawled over the baby. Tiffany denied this occurred. At the hospital, Tiffany handled E. inappropriately, permitting her head to hang back over Tiffany's arm and bouncing her up and down. The CSW informed Tiffany of the correct way to hold her baby and advised her not to bounce E. Tiffany seemed responsive, but did not seem to understand that she had to be more careful with a baby with broken bones. Tiffany told the CSW that E. had been colicky and whiny since birth. Jeremy told the CSW that he watched the babies when Tiffany was at school. Tiffany's mother, Donna M., stated that Monique could not have hurt the baby. Neither parent had any explanation for how E. was injured.
*743 At the detention hearing on September 20, 2001, the court ordered the children detained; the Department was given discretion to release the children to an appropriate relative; Tiffany and Jeremy were given monitored visitation; and reunification services were ordered. Karen H., Jeremy's mother, requested custody of the children. D. was placed with her, and the court ordered that E. could be placed with her as soon as she was released from the hospital, with the provision that Jeremy was not to reside in her home. Karen was authorized as the monitor for the parents' visits with the children.
The report for the jurisdictional hearing held October 18, 2001, indicated that the CSW had visited Tiffany's home, Karen's home, and extensively interviewed Tiffany and Jeremy. Tiffany stated that Michele and Monique shared a bottom bunk, while D. slept in a crib. Tiffany slept by the door. Jeremy slept near the bed, and E. slept next to him. Sometimes E. would be next to the bunk bed. When visiting the home, the CSW noticed that Monique would roll out of the bed and land on the floor and crawl to the door. Tiffany denied that anyone in the house would have hurt E. Jeremy stated he would have noticed if someone had stepped on E. Dr. Tixon, the director of the Miller Abuse and Violence Intervention Center at Long Beach Memorial Hospital found that E.'s injuries were the result of "gross child abuse." Even with osteogenesis imperfecta, one would not see fractures like E.'s injuries. E. was placed in the foster home of Zena B.
At an ex parte hearing held October 25, 2001, the Department advised the court it could not recommend placing E. with Karen. Instead, the Department argued that E. needed to be placed in a medically fragile unit foster home. E. qualified as a "medically fragile child" because she had been diagnosed with closed lip schizencephaly, which could cause seizures, paralysis, developmental delay, and hydrocephalus. E. also had dual kidney malfunction. However, E. did not have osteogenesis imperfecta. Furthermore, Karen had a full-time job, Monday through Friday, 8:00 a.m. to 4:00 p.m. Karen's day care provider did not have sufficient training to care for someone like E. At the adjudication hearing held January 30, 2002, the court ordered that E. would continue to be detained in shelter care.
At the hearing, the court took testimony. Zena testified that she was licensed to care for medically fragile children. Zena has taken E. to the doctor about 20 times since E. came to her home in October 2001. Since E. has been living with Zena, she has not sustained any further injuries. When E. came to live with Zena, she could not hold her head up. Now E. is very happy. E. has trouble making a fist with her right hand.
Karen testified that she thought E. was a "cry baby," because she cried too much. She baby-sat E. one time, and did not observe any bruises on her body. When she visited E. at Tiffany's house and was holding her, E. would cry when Karen shifted her from one position to another. She never saw Tiffany hurt the child in any way.
Patricia Torres, the dependency investigator, testified that Donna would not let her speak to Monique. Tiffany and Jeremy told her conflicting stories about where they slept on the floor. Tiffany and Jeremy told her that Monique never handled E. Torres observed Monique tumble out of the lower bunk bed, land on the floor, and crawl through the door to the living room. Donna told Torres that Monique had cerebral palsy, was wheelchair-bound, and blind. Torres suggested to the family members that Monique might have caused *744 the injuries to E. Torres was told that somebody was always around E., so that would not have been possible.
Dr. Beverly Wood testified that she reviewed E.'s x-rays. The fracture of E.'s right femur (her right thigh bone) was near the hip. The fracture was rotated and showed a large amount of new bone growth, making the break about five to seven weeks old. The large amount of new bone formation indicated that there "was a great deal of motion which occurred at the site of the fracture following the fracture itself." Dr. Wood opined that the fracture was non-accidental. E. also had a fracture of the left femur which showed it was also a rotation injury. Dr. Wood opined this fracture was about one and one-half to two weeks old. E.'s rib fractures were about three weeks old. Such fractures were commonly the result of shaking an infant. These fractures were also non-accidental. Her left arm fracture was "acute," in that no healing had started, making it less than 10 days old. This fracture was also caused by a twisting or pulling injury, and was non-accidental. E. had a non-accidental fracture of a bone in her fifth finger, which showed a bit of early healing, making it between 10 days to two weeks old. Her foot fracture was almost completely healed, making it more than a month old. Such a fracture would have been caused by a squeeze to the foot or from striking the foot with an object. Dr. Wood opined that E.'s bone density was normal for a child her age, with the exception of her right leg, which showed a lot of mineral resorption in the bone. Such resorption results from not moving the leg, a normal response considering the pain the child was probably in.
A large amount of force would have to be applied to cause these fractures. Infants have very flexible ribs and the ribs can be deformed a lot before they break. Dr. Wood did not think it likely that most of the fractures were caused by E. being stepped on. Infants that have osteogenesis imperfecta are usually born with fractures they sustain in utero, and their bones appear very deformed at birth. They have blue sclera, but blue sclera are present in most 10-week old infants. Osteopenia generally is not a term applied to children; it is demineralization of the bone, as in post-menopausal women. E. has osteoporosis of the right leg as a result of the fracture. The leg fractures could cause deformity and loss of blood supply at the top of the bone, which could result in arthritis.
Donna M. lives with her four children (Raymond, age 22, Tiffany, age 19, Michelle and Monique, age 18) and Jeremy. Donna works five days a week from 8:00 a.m. to 2:30 p.m. Monique is on the level of a seven-year-old because of cerebral palsy. She has some speech delays, although she can talk and most of the time she understands what is said to her. She gets around by "scooting," sliding on one side. She is unable to use her right side. She uses a wheelchair for school, but not at home. She is able to partially feed herself. She cannot bathe or dress herself. Monique can get out of bed herself. She puts her left foot out until it touches the floor, stands holding onto the bed, and then lowers herself into a sitting position.
When E. came home from the hospital, Donna noticed that her eyes were "funny." They were very, very blue, and E.'s hands were in a "clawed" position. E. was very tiny with a tiny head. E. weighed five pounds 12 ounces at birth. Although the hospital said the E. was a full-term baby, Donna did not believe it. Donna sensed that E. was not a healthy baby.
Jeremy watched E. while Tiffany was at school, and Michelle would watch E. when she came home from school. They did not *745 use a babysitter. Donna did not believe Tiffany took E. to any of her friends' homes. Donna's 30-year-old daughter lives in the same building in another apartment, and Tiffany on occasion took E. over there. Raymond and Monique did not take care of E. Sometimes Donna's niece would baby-sit at her house. She had a two-year-old son. E. was never left alone with Raymond, but sometimes she was left alone in the room with Monique. Monique would touch E., just to see that she was there. Monique did not understand when Donna asked her if she had hurt E. At times, E. was left alone with Michelle or Jeremy. Donna never saw Jeremy or Tiffany fight, and she never saw anyone mistreat E. Donna thought Tiffany was a good mother.
When Donna changed E.'s diapers, she cried all the time. Donna thought E. had colic. E. would cry when she had her bath and when she got dressed. It was a "screechy" cry. E. had cried this way since she was a couple of weeks old. During August 2001, when she was just slightly over a month old, her crying became worse. When Donna saw E.'s swollen leg in September 2001, she thought it was a spider bite so she put a hot compress on it. After it did not improve in a couple of days, they took her to the doctor.
Tiffany testified that she went to school Monday through Thursdays. She went on Mondays and Wednesdays from 8:00 a.m. to 12:00 p.m. and from 4:30 p.m. to 6:30 p.m., and on Tuesdays and Thursdays from 10:00 a.m. to 3:00 p.m. and 6:30 p.m. to 10:00 p.m. While she was at school, Jeremy took care of E. and D. When Tiffany was at home, she took care of E. Dr. Armasillo, E.'s pediatrician, saw her in July 2001 for her well baby checkup. Dr. Armasillo looked at E.'s eyes, listened to her heartbeat and her lungs. He did not open her diaper. E. was not crying at this examination. Tiffany told Dr. Armasillo about E.'s crying and her eyes. Dr. Armasillo said he thought it was colic. Tiffany picked up a pamphlet on colic from the doctor's office, but did not change anything that she did with E. E.'s eye would leak fluid. Dr. Armasillo told her to rub it three times a day, but this did not help.
Tiffany was never alone with the baby because there was always somebody at home. She would take care of E. when she was at home. She never saw anyone hurt E. No one in the household got upset because E. cried all the time. When E. was born, Tiffany was not told that she had any problems. At the hospital, the social worker told her she was holding E. the wrong way. In July, Dr. Armasillo had not commented on the way she held the baby.
Jeremy recalled they ran tests on E. at the hospital after she was born, but they were not advised what the tests were for. While staying at Tiffany's house, Jeremy always slept on the floor. E. never slept next to the bunk bed or in between Jeremy and Tiffany. He also noticed that E. cried more than D. a few days after she came home from the hospital.
Dr. Brooke La Ducca testified that she admitted E. to the hospital. She met Tiffany at the time, and found her to be very concerned about E.'s well being. Tiffany was staying in the room with E. When Dr. La Ducca found out about E.'s broken bones, she became concerned about Tiffany being in the room. However, she found Tiffany to be "sincere" and believed that Tiffany did not know how E. was injured. Aside from the fact Tiffany was difficult to rouse from a deep sleep one morning, Dr. La Ducca saw nothing that concerned her with the way Tiffany was handling the baby.
Respondents argued that subsection (e) contained a mens rea element, and the *746 Department had not met its burden of proving the child was being abused, or that the parents reasonably should have known someone else was abusing E. They argued the Department's implied attempt to rely on the presumption of section 355.1, subdivision (a) that injuries that ordinarily would not be sustained except as the result of abuse may be prima facie evidence to bring the child within section 300, subdivisions (a), (b) and (d) was misplaced, because the statutory language specifically excluded subdivision (e). Thus, the issue was whether the Department had established the injuries were caused non-accidentally and the identity of the perpetrator, and the evidence before the court was insufficient to support such an inference.
The Department countered that the identity of the person who caused E.'s injuries need not be established, relying on In re Christina T. (1986) 184 Cal.App.3d 630, 229 Cal.Rptr. 247. The Department also argued that it need not show intent to harm the child, relying on In re Jeannie Q. (1973) 32 Cal.App.3d 288, 107 Cal.Rptr. 646. The Department pointed out that in the instant case, because the parents were always present, it was reasonable to assume that the parents committed the abuse themselves or were aware of its infliction upon the child.
The court found that the evidence did not establish who injured the child. However, the court was convinced that the injuries were intentionally inflicted and were caused by someone in the household, but the court found there was no evidence that anyone knew that anything was happening to E. The court sustained the petition as to section 300, subdivisions (a), (b) and (j), but dismissed the allegations under section 300, subdivisions (i) and (j). Tiffany and Jeremy were ordered to participate in counseling, and a parenting course through Regional Center with an emphasis on special needs children.

DISCUSSION
The Department contends the dependency court erred in dismissing the allegation made pursuant to section 300, subdivision (e) because there was no identified perpetrator. The Department argues that on the contrary, the plain language of subdivision (e) does not require that the identity of the perpetrator be known where the abuse is caused by a parent; it is only where the abuse is caused by someone other than a parent that the parent must know or reasonably should have known the person was abusing the minor. (See In re Joshua H. (1993) 13 Cal.App.4th 1718, 1727, 17 Cal.Rptr.2d 282.) Respondents[4] argue that under subsection (e), the Department must establish that the parents had actual knowledge E. was being abused and that some person was committing the abuse. It is insufficient to merely establish the fact of the abuse. Here, the parents had no idea E. was being abused, much less by whom.
Section 300, subdivision (e) provides that the court has jurisdiction where "[t]he child is under the age of five and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child. For the purposes of this subdivision, `severe physical abuse' means any of the following: any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; any single act of sexual abuse which causes significant bleeding, deep bruising, or significant external or internal *747 swelling; or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food. A child may not be removed from the physical custody of his or her parent or guardian on the basis of a finding of severe physical abuse unless the social worker has made an allegation of severe physical abuse pursuant to Section 332."
In re Joshua H. interpreted this language to impose three requirements on the Department to establish jurisdiction under this subsection: (1) there is a minor under the age of five; (2) who has suffered severe physical abuse as defined in section 300, subdivision (e); (3) by a parent or any person known to the parent if the parent knew or reasonably should have known that the person was physically abusing the minor. {In re Joshua H., supra, 13 Cal. App.4th at p. 1727, 17 Cal.Rptr.2d 282.) In Joshua H., an infant boy was repeatedly beaten by his mother and the mother's live-in boyfriend. (Id. at pp. 1722-1723, 17 Cal.Rptr.2d 282.) The mother contended the case was not within subdivision (e) because while she was aware her boyfriend was hitting her son, she did not know how severe the abuse was.[5] The court rejected her contention this did not bring the matter within subdivision (e). "When, as here, an infant suffers severe physical abuse at the hands of someone other than a parent[.] ... [t]he subdivision does not require the parent's actual or constructive knowledge that the minor in fact suffered severe physical abuse within the statutory definition. Indeed, several of the listed injuries, such as bleeding (internal), internal swelling, and bone fracture, may not be visible; they may be discovered only after medical examination or testing. We do not believe the Legislature intended so to limit the statute." (Id. at p. 1729, 17 Cal. Rptr.2d 282 (emphasis added).)
In re Christina T. (1986) 184 Cal.App.3d 630, 229 Cal.Rptr. 247, upon which the Department relied in the dependency court, involved sexual abuse of a six-year-old girl. The dependency court found there was "no question" of sexual abuse, but was unable to conclusively determine from the evidence whether it was the girl's father or her mother's boyfriend. (Id. at p. 640, 229 Cal.Rptr. 247.) Because the evidence was insufficient to establish the identity of the culprit, the court dismissed the petition brought under section 300, subdivisions (a) and (d). The appellate court reversed, pointing out that the dependency court "mistakenly believed it must also find, or be able to find from the evidence, who specifically was sexually abusing the child, before it could find the allegations of the petition to be true." (Ibid.) Unlike criminal proceedings, where establishing the identity of the perpetrator is paramount, the purpose of dependency proceedings was to fashion appropriate orders in the best interests of the child, which would include removing the child from the home, establishing visitation, and the scope of Departmental supervision. (Ibid.)
In re Sheila B. (1993) 19 Cal.App.4th 187, 23 Cal.Rptr.2d 482 involved allegations of sexual abuse made by a 10-year-old girl in an overprotective home. The girl later recanted the allegations, and a physical examination was inconclusive, neither confirming nor ruling out molestation. *748 (Id. at pp. 192-193, 23 Cal.Rptr.2d 482.) In affirming the dependency court's dismissal of the petition on the basis of insufficient evidence, the court noted the standard of review and stated "[o]ur review of the record ... does not persuade us that there was indisputable evidence of abuse." Absent such evidence, the child did not come within the provisions of section 300. (Id. at p. 200, 23 Cal.Rptr.2d 482.)
Interestingly, both the Department and respondents argue that In re Joshua H, supra, 13 Cal.App.4th 1718, 17 Cal.Rptr.2d 282, supports their position. The Department argues that the statute only requires that the parent knew or reasonably should have known of the abuse when it is committed by someone other than the parent. (Id. at p. 1729, 17 Cal.Rptr.2d 282.) The Department argues the evidence clearly established that the mother and father were E.'s caretakers and she was with one or the other of them at all times. Thus, the only reasonable conclusion is that the parents inflicted E.'s injuries, and we therefore need not be concerned with their level of knowledge or intent. Tiffany contends that In re Joshua H. "proposed that some knowledge is necessary," pointing to the fact that the mother knew that her boyfriend was abusing her son. (Id. at pp. 1723, 1731, 17 Cal.Rptr.2d 282.) Indeed, respondents contend, there is no evidence that Tiffany or Jeremy reasonably knew or should have known of the abuse.
In evaluating whether E. came under section 300, subdivision (e), we use the substantial evidence standard of review, where we determine whether evidence that is of reasonable, credible and solid value supports the dependency court's findings. We do not reweigh the evidence, nor do we consider matters of credibility. (In re Sheila B, supra 19 Cal.App.4th 187 at pp. 199-200, 23 Cal.Rptr.2d 482.)
Essentially, the Department employs a "res ipsa loquitur"[6] type of argument to support a jurisdictional finding under subdivision (e). There was severe physical abuse of a child under five (E.'s broken bones) and the child was never out of her parents' custody and remained with a family member at all times; therefore, Tiffany and Jeremy inflicted the abuse or reasonably should have known someone else was inflicting abuse on their child, bringing E. within the language of section 300, subdivision (e). We agree. In the instant case, the only reasonable conclusion which may be drawn from the evidence is that Tiffany and Jeremy reasonably should have known E. was being physically harmed by someone in the house. The infant, pursuant to the admissions of everyone who resided in the house, was never alone. The newborn infant slept on the floor near a bed occupied by a blind, developmentally delayed adult who habitually rolled out of bed and dragged herself around the apartment. The child cried whenever she was handled; having received a diagnosis of likely colic, the parents did nothing to follow up. The only reasonable conclusion to be drawn from the facts of the instant case was that someone in the home was causing E.'s injuries, and that Tiffany and Jeremy reasonably should have known (since they lived there) the identity of the perpetrator. Such an argument may be sustained without resorting to the presumption of section 355.1.[7]
*749 Here, however, the dependency court impliedly concluded that the statute required actual knowledge, i.e., direct evidence of abuse. Because Tiffany, Jeremy and other members of their extended family expressly disavowed any knowledge of how E.'s injuries were sustained, the court erroneously concluded they reasonably could not have known how those injuries were sustained. This logical leap is unsupportable. Whether Tiffany and Jeremy actually knew E. was being injured by someone else is not required by the language of section 300, subdivision (e) or In re Joshua H.; the only requirement is that they reasonably should have known. Furthermore, where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out. A finding may be supported by circumstantial evidence as it is here. Otherwise, a family could stonewall the Department and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under subsection (e).
We point out that nothing in our decision affects the ability of the dependency court to order reunification services for Tiffany and Jeremy.

DISPOSITION
The order of the superior court finding that E. is not a person coming within the provisions of section 300, subdivision (e), is reversed.
We concur: JOHNSON, Acting P.J., and WOODS, J.
NOTES
[*] Brown, J., did not participate therein.
[**] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Unless otherwise indicated, all further references are to the Welfare and Institutions Code.
[2] Section 300, subdivision (e) provides, in part, that the court has jurisdiction where "[t]he child is under the age of five and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."
[3] This finding is of importance because, if the court is so inclined, based upon all of the evidence, reunification services may be denied to the natural parents. (§ 361.5 subds. (b)(5) and (b)(6).)
[4] Tiffany, Jeremy, D. and E. have all submitted briefs.
[5] The mother made two other challenges to jurisdiction under subdivision (e): (1) she herself did not severely abuse her son, and (2) her boyfriend did not inflict severe abuse on her son. The third contention under discussion, while narrowly drawn, is relevant to the instant appeal.
[6] This doctrine provides a rebuttable presumption of negligence where the instrumentality causing the injury was in the defendant's exclusive control, and the accident was of the type that ordinarily does not happen in the absence of negligence. (See Evid.Code, § 646.)
[7] Section 355.1, subdivision (a) provides that "[w]here the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor, is of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b) or (d) of Section 300."