Filed 6/11/13  K.S. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| K.S., | |
| Petitioner, | E058045 |
| v. | (Super.Ct.No. J246643) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Cheryl C. Kersey, Judge.  Petition denied.

Law Offices of Valerie Ross and Valerie Ross for Petitioner.

No appearance for Respondent.

Jean-Rene Basle, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Real Party in Interest.

1

Petitioner K.S. (father) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's order denying reunification services as to his son, K.S. (the child), and setting a Welfare and Institutions Code[1] section 366.26 hearing. On May 21, 2013, this court stayed the section 366.26 hearing, pending further order. We lift the stay.

Father now argues that: (1) the petition failed to plead essential facts to support allegations under section 300, subdivisions (a), (b), and (e); (2) there was insufficient evidence to support jurisdiction on the basis that father abused the child; (3) the juvenile court erred in denying the child's mother (mother)[2] and him reunification services under section 361.5, subdivision (b)(5); and (4) the child should have been placed with the maternal grandmother. We deny the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 2, 2012, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was four months old at the time. The petition alleged that the child came within the provisions of section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (e) (serious physical abuse). Specifically, the petition alleged that, while in the care, custody, and control of mother and father (the parents), the child sustained significant injuries, including a spiral

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] Mother is not a party to this petition.

fracture to his arm, inflicted by nonaccidental means. The petition also alleged that father failed to protect the child, in that he failed to consistently provide a safe environment for him and failed to seek immediate medical attention for him.

*Detention*

The social worker filed a detention report and stated that, on October 31, 2012, the parents brought the child to his regularly scheduled doctor's appointment. While being examined, the doctor found that the child had a spiral fracture to his right arm. The doctor reported to a social worker that the injury was inflicted on the child and was consistent with child abuse. The parents could not explain how the child was injured. However, they believed it was probably an accident, and that the child had injured himself trying to walk or roll around on the floor.

The social worker interviewed father regarding the child's arm fracture, and father said he did not know how the child was injured. Father stated that it may have been caused by the child trying to crawl; however, when asked whether the child was able to crawl or walk, since he was only four months old, father said no. Father also reported that mother's sister said she saw the child fall on his arm and twist his arm behind his back. When questioned further about how the child could have suffered the fracture, father said that sometimes mother would grab the child and put him in bed with them. However, he said they never rolled over him. Father reported that the child had been staying with the maternal grandmother the past several days, while he and mother were away. However, they returned on October 30, 2012, and the child had been in their care since 4:00 p.m. on October 30, 2012. Father suggested that the injury could have

3

occurred at the maternal grandmother's house, but he did not think anyone would do anything to the child on purpose.

The social worker also interviewed mother regarding the child's injury, and mother adamantly denied knowing how the child had suffered the spiral fracture. She said that when she picked the child up from her mother on October 30, 2012, he seemed cranky, but she did not notice anything wrong with his arm. When questioned further, mother stated that her sister said the child was lying in his playpen with his arm twisted, "and that he was moving around a lot." She also stated that perhaps the child's arm "was in the car seat wrong and someone buckled him wrong and pulled him out and did it." Mother denied any domestic violence in the home and denied that she or father abused the child. She also denied that her family could have injured the child and believed the child could have caused the injury to himself by "rolling around."

The child was transported to Loma Linda University Medical Center (Loma Linda) to be seen by a forensic medical examiner. The social worker spoke with Dr. Andrea Thorp at Loma Linda. Dr. Thorp reported that the injury was consistent with child abuse and that the child would be admitted to the hospital for a complete examination to see check for other injuries.

The court held a detention hearing on November 5, 2012, at which time it removed the child from the parents and detained him in foster care.

*Jurisdiction*

The social worker filed a jurisdiction report on November 20, 2012, and recommended that the court sustain the petition and order reunification services for the

4

parents.  The social worker reported that the child had sustained three nonaccidental injuries over a period of approximately two to four weeks.  The child had the spiral fracture of his right arm, and indications of two older fractures to his ankle and one of his ribs.  Dr. Amy Young opined that the rib fracture appeared to be about two weeks older than the arm fracture, but she was not able to determine a time frame for the ankle fracture.  The ankle fracture and rib fracture were never treated.  The social worker reported that there was no indication the maternal grandmother harmed the child, since she had no history of child abuse, substance abuse, or domestic violence.

The social worker concluded that, because the child's arm discomfort did not appear until after he returned to the parents' care, the spiral fracture occurred while in their care and custody.  However, both parents gave inconsistent and conflicting explanations of how the child could have sustained his injuries.  Father eventually admitted that the child may have slipped out of his hands when he was "playing [S]uperman" and had to grab the child to prevent him from falling on the floor.  The social worker spoke with several people who had concerns that father had been abusive or controlling with mother.  The parents admitted that they argued, but denied any domestic abuse.  The social worker recommended services since the parents had never received any previous services and the matter was still being investigated by the police.

A jurisdiction/disposition hearing was held on November 26, 2012, and the matter was set contested by the child and continued.

The social worker filed an addendum to the jurisdiction/disposition report on December 31, 2012, and changed his recommendation to no reunification services for the

parents.  The social worker reported that the police concluded its investigation and found sufficient evidence to charge father with child endangerment.  Several witnesses stated that they had seen him be abusive with his former girlfriend.  Other witnesses said they had seen him become so angry with mother that he punched holes in the walls, with the child present.  Father was also observed "rough-housing" with the child, even when the child was just a few weeks old.  Father was arrested, arraigned, and posted bail in December 2012.

The social worker reported that Dr. Young did a follow-up examination with the child on December 14, 2012, and she stated that the healing fractures of the ribs were consistent with "front to back squeezing of the ribcage/chest" of the child and were consistent with a finding of child abuse.[3]  Dr. Young further stated that the rib fractures occurred close to the time of the arm fracture.  Dr. Young also noted that the arm fracture was spiral in description, which implied a "twisting mechanism of injury."  She stated that the fracture was an inflicted injury that was consistent with child abuse.

A copy of the police report was provided to the parties and the court.  The police interviewed father, who said he did not think his son had been abused.  Rather, he believed the injury was a "one time accident."  He suggested that the child possibly had brittle bones.  However, the police spoke with Dr. Young and asked if the child had a disease that caused brittle bones that might break easily, and she said he did not. Dr. Young told the police that the child's arm fracture was severe and caused him a lot of

---

[3] It is not clear whether there was more than one rib fracture, since the initial report indicated there was one rib fracture, but latter reports indicated more than one.

6

pain.  The injury would have been very noticeable to anyone since the child would not have moved his arm and would have cried in pain if it was manipulated while dressing or bathing him.  Because these symptoms were not seen while the child was at the maternal grandmother's house, Dr. Young opined that the injury occurred after the child returned home on October 30, 2012.  When asked whether rolling over the child, dropping him six inches, or dropping him four feet from overhead and catching him by one arm could cause the arm fracture, she said none of those actions would produce enough twisting force needed to cause the arm injury.  Dr. Young said the rib fractures were caused by someone squeezing the child, but since she could not date the rib injuries, they could have occurred any time in the weeks before the doctor's appointment.

When confronted with evidence of the child's past ankle fracture and rib fracture(s), father said he did not "feel that the test results were very clear."  He said he had nothing to do with causing the child's injuries.  The interviewing officer asked if he would take a polygraph examination, and father agreed.  During the test, father was asked if he caused the injury to the child's arm, and father said no.  The polygraph showed that father was not telling the truth when he answered that question.  When confronted with the polygraph results, father admitted that he lied.  He then said he accidentally dropped the child six to 12 inches and caught him by his arm.  Father went over the events of the evening prior to the doctor's appointment and said the child seemed irritated.  The child would not take his bottle at first, but eventually did.  Mother took a shower that evening, and during that time, father played with the child and dropped him.  The following morning when the parents gave the child a bath, they noticed that it "bugged" him when

7

they washed his right arm. They decided to ask the doctor about it at his appointment. When asked about the other injuries, father said he could not think of anything that would have caused them. He said the child's ankle was possibly injured when he (father) "flopped" on the couch next to the child and hit the child's ankle with his arm.

The child's counsel subsequently withdrew his contest, but the matter was set contested on behalf of the parents. Father's counsel and mother's counsel also requested to bifurcate the matter. The matter was continued.

A contested jurisdiction/disposition hearing was held on February 5, 2013. Mother testified and said she had no explanation for the child's injuries, except the arm fracture. She said the arm fracture could have happened when father was playing with the child. She had no idea who broke the child's rib(s), but did not think father did it. Mother also testified that when she picked up the child at 4:00 p.m. on October 30, 2012, from her mother's house, the child was fine. She said she first noticed that his arm appeared to be injured when she was bathing him before the doctor's appointment the next morning. She agreed that the child's arm was broken sometime between 4:00 p.m. on October 30, 2012, and 8:00 a.m. on October 31, 2012. Father was called to testify, but plead the Fifth Amendment, due to his criminal charges. The social worker also testified and said it was not in the best interest of the child to offer the parents services. He opined that their failure to accept responsibility was a good indicator that there would be a continued risk to the child if he was to be returned to them.

After hearing oral argument and reviewing the reports and documents submitted, the court found that the child came within section 300, subdivisions (a), (b), and (e), and

8

declared him a dependent of the court. The court found father to be the presumed father of the child. The court stated that the parents only wanted to "sit back and claim accidents, or [that they did not] know, or it [was] a disease without any evidence . . . ." The court then denied reunification services to both parents pursuant to section 361.5, subdivision (b)(5), noting that neither of them had admitted any abuse and that they were "covering for each other." The court also found that neither parent had shown that services would prevent reabuse. The court set a section 366.26 hearing and authorized CFS to place the child in a prospective concurrent planning home pending the hearing.

ANALYSIS

I. The Court Properly Denied Father Reunification Services

Father argues that the court erred in denying services to him pursuant to section 361.5, subdivision (b)(5), since it erroneously found that the child was brought within the jurisdiction of the court under section 300, subdivision (e). Within the context of this argument, he contends that the section 300 petition failed to plead sufficient facts to constitute the essential elements of section 300, subdivision (e). We note that he makes the same insufficient pleading argument with regard to the factual allegations under section 300, subdivisions (a) and (b). He further contends that there was insufficient evidence to support the court's finding that the child came under section 300, subdivision (e). We conclude that the court properly denied him services.

9

A. *Father Has Forfeited His Right to Challenge the Adequacy of the Petition By Failing to Raise the Issue Below*

Father argues that the section 300 petition failed to plead factual allegations sufficient to constitute the essential elements of section 300, subdivisions (a), (b), or (e). CFS argues that father forfeited his right to challenge the sufficiency of the petition by failing to object below. We agree with CFS.

The sufficiency of a petition cannot be challenged for the first time on appeal. (*In re S.O.* (2002) 103 Cal.App.4th 453, 459-460 (*S.O.*).) "In the initial 'pleading' stage, the role of the petition is to provide 'meaningful notice' that must 'adequately communicate' social worker concerns to the parent. [Citation.]" (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1037 (*Jessica C.*).) "'Given that lay social workers are usually lumbered with the task of writing petitions, they must be given a certain amount of slack. If the parent believes that the petition does not "adequately communicate" [CFS]'s concerns or is otherwise misleading, the onus is on the parent to challenge the petition at the pleading stage.' [Citations.]" (*S.O.*, at pp. 459-460.) Furthermore, "after a hearing on the merits has been held on the petition, the focus must necessarily be on the substance of the allegations found true by the juvenile court, not idiosyncratic particulars of the social worker's precise language. Anything less would allow parents to hold linguistic deficiencies in the petition as a kind of trump card by which they could attack a finding that a child fell within one of the descriptions of section 300, even though that finding was supported by substantial, indeed overwhelming evidence." (*Jessica C.*, at pp. 1037-1038.)

Here, father failed to challenge the wording of the allegations at the trial court level and, thus, has waived any defect in the pleadings. Moreover, a hearing on the merits has been held on the petition. Thus, "the focus must necessarily be on the substance of the allegations found true by the juvenile court, not idiosyncratic particulars of the social worker's precise language." (*Jessica C.*, *supra*, 93 Cal.App.4th at pp. 1037-1038.) Consequently, father's insufficiency of the pleadings claim is barred.

B. *The Court Properly Found That the Child Came Within Section 300, Subdivision (e)*

Father argues that there was no substantial evidence to support the court's finding that he abused the child. We conclude that the court properly found that the child came within section 300, subdivision (e).

1. *Standard of Review*

Section 300, subdivision (e), provides that the court has jurisdiction where "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." To establish jurisdiction under this subdivision, CFS must show that: "(1) there is a minor under the age of five; (2) who has suffered severe physical abuse as defined in section 300, subdivision (e); (3) by a parent or any person known to the parent if the parent knew or reasonably should have known that the person was physically abusing the minor. [Citation.]" (*In re E.H.* (2003) 108 Cal.App.4th 659, 668 (*E.H.*).)

11

In evaluating whether a child comes under section 300, subdivision (e), "we use the substantial evidence standard of review, where we determine whether evidence that is of reasonable, credible and solid value supports the dependency court's findings. We do not reweigh the evidence, nor do we consider matters of credibility. [Citation.]" (*E.H., supra*, 108 Cal.App.4th at p. 669.)

2. *The Evidence Was Sufficient*

Father asserts that evidence supporting the "concept" that he abused the child was based on mere speculation and the assumption that "someone who has engaged on one occasion in domestic violence with an ex girlfriend and someone who wrestles a brother-n-law [*sic*] is a child abuser." He further claims that the evidence merely showed that he played "Superman" with the child and lost his grip on him, and that the child fell about four feet before he was able to jerk him by the arm to prevent him from hitting the floor. We disagree.

The case of *E.H.*, *supra*, 108 Cal.App.4th 659 is instructive. In that case, the minor lived with her mother and her mother's family. (*Id*. at p. 662.) The minor was hospitalized with multiple rib fractures, fractures of the wrist, femur, feet, hands, and hip. The fractures were at different stages of healing. (*Id*. at p. 661.) Neither the mother nor the father, who did not live with them, had any explanation for how the minor was injured. (*Id*. at p. 662.) Only the parents and mother's family took care of the minor. (*Id.* at p. 665.) Medical personnel concluded that the minor's injuries were the result of child abuse. (*Id.* at p. 663.) The lower court dismissed an allegation made under section 300, subdivision (e), because there was no identified perpetrator. (*E.H.*, at p. 667.)

However, the appellate court reversed, noting that the Department essentially employed a "res ipsa loquitur" type of argument to support a jurisdictional finding under section 300, subdivision (e). (*E.H.*, at p. 669.) The appellate court noted that there was severe physical abuse (the minor's broken bones) and that the minor was never out of her parents' custody. (*Id.* at pp. 669-670.) The court found that "[t]he only reasonable conclusion to be drawn from the facts of the instant case was that someone in the home was causing [the minor's] injuries, and that [the parents] *reasonably* should have known (since they lived there) the identity of the perpetrator." (*Id.* at p. 670.) The court specifically stated that "where there is no identifiable perpetrator, only a cast of suspects, jurisdiction under subdivision (e) is not automatically ruled out. A finding may be supported by *circumstantial evidence* as it is here. Otherwise, a family could stonewall the Department and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under subdivision (e)." (*Ibid.*, italics added.)

The court here properly found that the child came within its jurisdiction by the circumstantial evidence in this case. Mother testified that when she picked up the child at 4:00 p.m. on October 30, 2012, from her mother's house, he was fine. She said she first noticed that his arm was injured when she was bathing him the next morning. Dr. Young stated that the child's arm fracture was severe, and that the injury would have been very noticeable since the child would not have moved his arm and would have cried out in pain while dressing or bathing him. Because these symptoms were not seen while the child was at the maternal grandmother's house, Dr. Young opined that the injury occurred after the child returned to the parents' custody and care. Mother agreed that the

child's arm was broken sometime between 4:00 p.m. on October 30, 2012, and 8:00 a.m. on October 31, 2012. Father admitted that the child was in his and mother's custody during that time period. Furthermore, Dr. Thorp and Dr. Young examined the child and opined that his arm fracture was nonaccidental and caused by abuse. Father initially told the police he did not cause the child's injury and offered many explanations for it. However, the polygraph examination showed that he lied when asked if he caused the injury to the child's arm. Father then said he accidentally dropped the child and caught him by his arm. However, the evidence showed that the arm fracture was caused by a "twisting mechanism of injury." Dr. Young stated that none of father's explanations for the injury would have produced enough twisting force needed to cause the arm injury. In addition, Dr. Young found rib fractures, and stated that they were consistent with "front to back squeezing of the ribcage/chest" and were consistent with a finding of child abuse. We also note the evidence that father had been abusive with his former girlfriend, that he had been so angry with mother that he punched holes in the walls, and that he "rough-housed" with the child, even when the child was only a few weeks old.

Based on the evidence before it, the only reasonable conclusion that the court could come to was that father caused the child's injuries, or, he reasonably should have known who caused the child's injuries. (*E.H.*, *supra*, 108 Cal.App.4th at p. 670.) Therefore, the court properly found that the child came within section 300, subdivision (e).

14

### C. *The Court Properly Denied Reunification Services*

"We affirm an order denying reunification services if the order is supported by substantial evidence. [Citation.]" (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 839.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "We do not reweigh the evidence, nor do we consider matters of credibility." (*E.H.*, *supra*, 108 Cal.App.4th at p. 669.)

"In enacting subdivision (b) of section 361.5, the Legislature has recognized that under some circumstances it may be futile to offer a parent reunification services. [Citation.]" (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 20 (*Kenneth M.*).) Section 361.5, subdivision (b), provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (5) That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian." Section 300, subdivision (e), and section 361.5, subdivision (b)(5), do not require identification of the perpetrator. (*Kenneth M.*, at p. 21.) "Read together, those provisions permit denial of reunification services to either parent on a showing that a parent or someone known by a parent physically abused a minor. [Citation.] Thus, 'conduct' as it is used in section 361.5, subdivision (b)(5) refers to the

15

parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*Ibid.*)

In order to deny father reunification services under section 361.5, subdivision (b)(5), the threshold issue was whether the child fell within section 300, subdivision (e). As discussed above, there was sufficient evidence to support the court's finding that father inflicted the abuse or reasonably should have known someone else was inflicting abuse on the child. (§ 300, subd. (e); see *ante*, § B.) Therefore, the court properly denied father reunification services under section 361.5, subdivision (b)(5).

## II. Father Lacks Standing to Raise Certain Issues

A. *Father Lacks Standing to Challenge the Court's Order Denying Mother Services*

Father argues that the court erred in denying reunification services to mother, when there was no evidence that she caused the injuries to the child or knew the child was being abused. He further asserts that the court failed to identify "what conduct of Mother brought her within the bypass provision of subdivision (b)(5)." CFS argues that father lacks standing to challenge the court's denial of mother's services. In response, father claims standing on the ground that, "if this court reverses the order setting the .26 as to mother, then such ruling inures to the benefit of father in that the termination of his parental rights would also no longer be at issue." However, all of the cases father cites in

support this claim are inapposite.[4]  Moreover, we are unaware of any authority for the proposition that one parent can claim that the court erred in denying the other parent services when the other parent has not appealed.[5]  Indeed, the general rule is that an appellant may not urge errors that affect only another party who does not appeal.  (*In re Gary P.* (1995) 40 Cal.App.4th 875, 877 (*Gary P.*).)  A parent therefore lacks standing to raise issues on appeal that do not affect his or her own interests.  (*Id*. at p. 876.)

Although we are satisfied that father was not aggrieved by the court's denial of services to mother under section 361.5, subdivision (b)(5), we will briefly address his contention on the merits.  Sections 300, subdivision (e), and 361.5, subdivision (b)(5), read together, "permit denial of reunification services to either parent on a showing that a parent or someone known by a parent physically abused a minor.  [Citation.]  Thus, 'conduct' as it is used in section 361.5, subdivision (b)(5) refers to the parent in the

---

[4]  Father cites *In re L.Y.L.* (2002) 101 Cal.App.4th 942 (*L.Y.L*) and *In re Erik P.* (2002) 104 Cal.App.4th 395 (*Erik P.*), both of which discuss whether a parent has standing to raise the section 366.26, subdivision (c)(1)(E) sibling relationship exception to the termination of parental rights.  (*L.Y.L*, at pp. 948-950; *Erik P.*, at pp. 401-402.)  He also cites *In re Silvia R.* (2008) 159 Cal.App.4th 337, 344-345, which held that a mother had standing to appeal portions of a disposition order that ordered two nonparties to participate in counseling.  He further cites *In re K.C.* (2011) 52 Cal.4th 231, in which the Supreme Court held that a father whose parental rights had been terminated had no standing to appeal the grandparents' section 388 petition to modify the child's placement.  (*Id*. at p. 239.)  Finally, father cites *In re R.V.* (2012) 208 Cal.App.4th 837, 849, which held that a father had standing to appeal the court's dispositional order removing custody from the mother and placing the child in foster care.

[5]  Mother originally filed a notice of intent to file a writ petition on February 15, 2013.  However, after reviewing the record, her counsel found no arguable issues and, thus, informed this court that mother would not be filing a writ. Pursuant to counsel's letter filed on April 17, 2013, this court dismissed mother's petition.

17

household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*Kenneth M.*, *supra*, 123 Cal.App.4th at p. 21.)  Here, Dr. Young opined that the injury occurred after the child returned home from the maternal grandmother's house, and mother agreed that the child's arm was broken sometime between 4:00 p.m. on October 30, 2012, and 8:00 a.m. on October 31, 2012.  The evidence showed that the child's injury was the result of abuse, and that he was never out of his parents' custody during the time period when the injury occurred.  The only reasonable conclusion to be drawn from the evidence was that mother knew or reasonably should have known of the abuse.  (See *E.H., supra*, 108 Cal.App.4th at p. 670; *Kenneth M.*, at p. 21.)  Thus, the court properly denied her services.

B.  *Father Lacks Standing to Raise the Issue of Placement with the Maternal Grandmother*

Father briefly claims that the child should have been placed with the maternal grandmother since she testified that she would protect the child and obey all rules and orders.  Father lacks standing to raise this issue since it does not concern his rights. (*Gary P.*, *supra*, 40 Cal.App.4th at p. 876.)  Furthermore, he has asserted this claim without argument or citation to authority; therefore, no discussion is required.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

## DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

Acting P. J.

We concur:

McKINSTER

J.

RICHLI

J.