Filed 1/15/14  In re J.R. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D064189 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ014746) |
| v. | |
| MARIA R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Jamie A. Moran, under appointment by the Court of Appeal, for Minor.

Maria R. appeals the juvenile court's order placing her minor son, J., with his father, William S., and terminating the court's jurisdiction after a contested disposition hearing. Maria complains the evidence was insufficient to support the court's jurisdictional finding that she inflicted severe physical abuse on J. We affirm.

I.

FACTUAL AND PROCEDURAL BACKGROUND

The San Diego County Health and Human Services Agency (the Agency) filed a petition in the juvenile court on behalf of then-four-month-old J. under Welfare and Institutions Code section 300, subdivision (e),[1] alleging that Maria so severely physically abused him that he suffered a skull fracture with associated hemorrhage and multiple fractures of the long bones of his extremities. The Agency learned of these injuries one week earlier, when Maria noticed swelling on the side of J.'s head and took him to a hospital where a CT scan and skeletal survey were done. Because Maria had sole custody of J. but no satisfactory explanation for the multiple fractures, and a child abuse specialist concluded the fractures were consistent with abuse, the Agency detained J. and placed him in a foster home.

---

[1] Subsequent undesignated section references are to the Welfare and Institutions Code.

At the detention hearing, the juvenile court found, based on the social worker's detention report, that the Agency had made a prima facie showing that J. was a person described by section 300, subdivision (e); that continued care of J. in Maria's home was contrary to his welfare; and that removing J. from her custody was necessary to protect his health. The court ordered J. detained at a foster home and set the matter for contested jurisdictional and dispositional hearings.

At the jurisdictional hearing, the Agency offered into evidence the detention report, the jurisdiction/disposition report, and an addendum report prepared by social workers. The juvenile court admitted the reports.

The detention report contained summaries of a social worker's interviews of Maria, William, and J.'s babysitter, Whitney Lynd, and a telephone call with a nurse who saw J. for a follow-up visit after his hospitalization. Maria denied causing J.'s injuries and said she was unaware of any accidents that could have caused them. Maria said the only other person who took care of J. was Lynd, who was babysitting J. for about two-and-a-half months and about whom Maria had no concerns. According to Maria, when she picked up J. at Lynd's house on the day she took him to the hospital, Lynd told her he had been spitting up all day. Lynd, however, reported that she had cared for J. for only about one month; and on the day Maria took him to the hospital, J. " 'was not fussy' " and " 'slept the whole day.' " Lynd also denied J. suffered any physical trauma while under her care. William said he chose to have limited contact with J. to avoid conflict with Maria, whose "thyroid condition 'gives her attitude' " and who will not let William be alone with J. William also reported that Maria is " 'rough' " with J. Finally, the nurse

3

reported that Maria "was 'very disruptive' at [J.'s follow-up] visit," " 'slamming in and out of the [examination] room . . . [and] saying "F" this and "F" that.' " The nurse described Maria as " 'irrational and illogical' " and as " 'not able to communicate her concerns.' "

The jurisdiction/disposition report summarized a social worker's interviews of Maria and William. Maria again denied abusing J. The only explanation she offered for his multiple bone fractures was brittle bone disease. William described Maria as " 'crazy as hell,' " and stated that after living with her for two months he learned she was an "habitual liar." When the social worker asked William if he believed Maria had abused J., William replied, " 'Hell yes I do.' " On further questioning, William reported he once saw Maria " 'rolling [J.] over' in a 'quick and rough' manner" while she was changing him. William also stated he learned not to question or challenge Maria on any subject in the presence of J. "because of her propensity to escalate and 'start yelling.' "

The addendum report attached a physician's consultation report that stated that J. did not have brittle bone disease or other metabolic bone disease. The consultation report also stated that J. had sustained no additional fractures after he was placed in foster care.

At the jurisdictional hearing, the Agency called two physicians to testify about J.'s injuries: Sarah Villarroel, a pediatrician certified in child abuse, and Richard Campin, a pediatric radiologist.

Dr. Villarroel examined J. after Maria took him to the hospital for the skull fracture and associated hemorrhage. Dr. Villarroel ordered a skeletal survey (a series of radiographs of the bones), which revealed that the long bones of J.'s upper and lower extremities had multiple fractures in various stages of healing. She explained that the

4

type of fractures seen commonly results from "a forceful twisting or pulling of [the] extremity." According to Dr. Villarroel, J.'s fractures were "highly specific for inflicted injury," and she was "very certain" that J.'s injuries were "more likely than not" the result of "nonaccidental trauma."

Dr. Campin reviewed the skeletal survey ordered by Dr. Villarroel, as well as a follow-up survey taken two weeks later. He observed the skull fracture and multiple fractures of the long bones of J.'s extremities in various stages of healing. In Dr. Campin's opinion, the skull fracture occurred more recently than the fractures in J.'s extremities; the extremity fractures occurred on at least two occasions within six weeks of the date the follow-up survey was taken; and the extremity fractures were consistent with "someone violently shaking [J.]"

Maria introduced testimony from a pediatric orthopedic surgeon, Thomas Grogan, who disagreed with Drs. Villarroel and Campin. When Dr. Grogan reviewed J.'s skeletal surveys, he observed the skull fracture and "evidence of calcification adjacent to . . . the end[s] of the long bones" of J.'s extremities. In Dr. Grogan's opinion, however, it was "highly unlikely those [calcifications] were fractures." Rather, they were probably merely "projections" of the bones that resulted from the positioning of the radiographic equipment relative to J.'s extremities when the skeletal survey was done.

After the medical experts testified, the Agency called the social worker who interviewed Lynd. She described Lynd as "very credible." The social worker also testified that she asked Lynd to have a skeletal survey done on her infant daughter, Lynd did so, and the survey "came back negative."

5

After receiving the evidence described above and hearing argument from counsel, the juvenile court found the Agency proved J. was a person described by section 300, subdivision (e). Specifically, the court found that J. suffered bone fractures on multiple occasions and that Maria inflicted those injuries.

At a subsequent dispositional hearing at which no additional evidence was presented, the court removed J. from Maria's custody, finding by clear and convincing evidence that based on J.'s injuries he could not safely be left with her (§ 361, subd. (c)(1)); granted William sole legal and physical custody of J. (§ 361.2, subds. (a), (b)(1), (e)(1)); granted Maria supervised visitation with J. once per week (§ 361.2, subd. (b)(1)); and terminated jurisdiction (*ibid.*).

II.

DISCUSSION

Maria argues the juvenile court did not have jurisdiction under section 300, subdivision (e) because the evidence did not establish either the identity of the perpetrator of J.'s injuries or that she knew or should have known that J. was severely injured before she noticed his swollen head and took him to the hospital. We disagree. As we shall explain, sufficient evidence showed that Maria inflicted J.'s injuries.

A.      *Standard of Review*

A juvenile court's jurisdictional findings are reviewable on appeal from the dispositional order. (*In re Jennifer V.* (1988) 197 Cal.App.3d 1206, 1209.) We review jurisdictional findings to determine whether they are supported by substantial evidence, i.e., evidence that is reasonable, credible, and of solid value such that a reasonable trier of

6

fact could make the findings. (*In re E. H.* (2003) 108 Cal.App.4th 659, 669 (*E. H.*).) We neither reweigh the evidence nor exercise independent judgment, but merely determine whether sufficient facts support the findings. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) In doing so, we review the whole record in the light most favorable to the findings, resolving all conflicts and drawing all reasonable inference in support of them. (*Ibid.*)

B.    *Analysis*

A child "is within the jurisdiction of the juvenile court" if "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child. For the purposes of this subdivision, 'severe physical abuse' means any of the following: . . . more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness . . . ." (§ 300, subd. (e).) This language "impose[s] three requirements on the [Agency] to establish jurisdiction under this subdivision: (1) there is a minor under the age of five; (2) who has suffered severe physical abuse as defined in section 300, subdivision (e); (3) by a parent or any person known to the parent if the parent knew or reasonably should have known that the person was physically abusing the minor." (*E. H.*, *supra*, 108 Cal.App.4th at p. 668.) The Agency presented evidence sufficient to establish each of these three requirements.

First, there is no dispute that J. "is under the age of five years." (§ 300, subd. (e).) Separate questionnaires signed by Maria and William state that J. was born in 2012.

7

Second, the Agency presented sufficient evidence that J. "suffered severe physical abuse," which includes "more than one act of physical abuse, each of which causes . . . bone fracture." (§ 300, subd. (e).) Dr. Villarroel testified the type of long bone fracture J. suffered was "nonaccidental" and "highly specific for inflicted injury." Dr. Campin testified J.'s skeletal surveys revealed multiple fractures that occurred on at least three separate occasions and that could have been caused by violent shaking. Although Dr. Grogan testified he saw no evidence of bone fractures on J.'s skeletal surveys, the juvenile court expressly found "Dr. Campin's opinion [was] the more credible on this record." On appeal, we "do not reassess the credibility of witnesses" (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177), and "must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53). Under these deferential standards, the Agency's evidence was sufficient to establish that J. suffered severe physical abuse.

Maria states in her reply brief that she "does not disagree" that "substantial evidence supported the finding that J. sustained severe physical abuse." She suggests in her opening brief, however, that to establish the "severe physical abuse" element of jurisdiction under section 300, subdivision (e), the Agency also had to prove that Maria knew or should have known that J. had been severely injured before she noticed the swelling on his head for which she took him to the hospital. We reject this suggestion. "The subdivision does not require the parent's actual or constructive knowledge that the

8

minor in fact suffered severe physical abuse within the statutory definition." (*In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1729.)

Third, the Agency presented sufficient evidence that the severe physical abuse J. suffered was perpetrated "by a parent." (§ 300, subd. (e).) Maria told the social worker who interviewed her that she and Lynd were the only two people who took care of J., and Maria admitted she had no concerns about Lynd. Although Maria repeatedly denied abusing J., she had no satisfactory explanation for how he fractured his skull or long bones. Maria's credibility was called into question by inconsistencies between what she and Lynd told the social worker about how long Lynd had been caring for J. and his behavior on the day Maria took him to the hospital for the skull fracture. Further, William, who lived with Maria for approximately two months, described her as an "habitual liar." The social workers' reports also documented Maria's poor impulse control. A nurse complained that during a follow-up visit after J.'s hospitalization, Maria directed obscene language at her and " 'slamm[ed] in an out of the [examination] room.' " William reported that Maria had a "propensity to escalate and 'start yelling' " whenever she was questioned or challenged and that he saw her handling J. in a " 'rough' " manner. Also significant were the facts that J. suffered no additional bone fractures after he was removed from Maria's physical custody, and that a skeletal survey of Lynd's infant daughter revealed no fractures. "While the evidence of parental [abuse] is in part 'circumstantial,' in the sense that there is little direct evidence of what went on in the home before [J.] was removed from it, that does not render such evidence insubstantial . . . ." (*In re Robert J.* (1982) 129 Cal.App.3d 894, 901.) "A finding may be

9

supported by circumstantial evidence as it is here." (*E. H.*, *supra*, 108 Cal.App.4th at p. 670.) We thus conclude that based on the evidence presented at the jurisdictional hearing, the juvenile court reasonably could find, as it did, that Maria inflicted J.'s injuries.

Maria argues it was not reasonable for the juvenile court to find she abused J. because there was no direct evidence she inflicted his injuries or had any idea J. was injured before she noticed his head was swollen and then took him to the hospital. Maria points out that on the day J.'s injuries were discovered, he had been under Lynd's care for 12 hours; and during the time period those injuries were inflicted, both Maria and Lynd cared for him. Maria thus contends the petition was not sustainable under section 300, subdivision (e), and the juvenile court should have dismissed it under *In re Roberto C.* (2012) 209 Cal.App.4th 1241 (*Roberto C.*). We disagree.

Maria's argument proceeds from the false premise that the Agency presented no evidence that she caused J.'s injuries. Although there was no *direct* evidence that Maria broke J.'s skull or long bones, as we have explained, there was ample *circumstantial* evidence to support the juvenile court's finding that she did. That circumstantial evidence distinguishes this case from *Roberto C.*, *supra*, 209 Cal.App.4th 1241, where the court found "no evidence linking the parents to the infliction of the injuries" and "no evidence that provide[d] any basis to attribute knowledge to [the] parents that [their child] was being abused, much less severely abused within the meaning of the statute." (*Id.* at p. 1254.) Dismissal of the allegations under section 300, subdivision (e) was thus proper in *Roberto C.*, because "*in the absence of evidence of actual abuse . . . by the parent*,

10

there must be a showing that the parent knew or had reason to know that another person to whom the child was exposed was engaging in conduct resulting in abuse or injury." (*Id.* at p. 1255, italics added.)  No such showing was required in this case, however, because the Agency presented evidence, albeit circumstantial, of actual abuse "by a parent."  (§ 300, subd. (e).)

## DISPOSITION

The order is affirmed.

_____
                                                                                    IRION, J.

WE CONCUR:

_____
                    BENKE, Acting P. J.

_____
                    AARON, J.

11