Filed 7/22/13  In re Jonathan F. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| In re JONATHAN F., a Person Coming Under the Juvenile Court Law. | B242144 |
| | (Los Angeles County Super. Ct. No. CK90647) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| NATALIE A., et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

The Law Offices of E. Thomas Dunn, Jr. and E. Thomas Dunn, Jr., for Defendant and Appellant Natalie A.

Janice A. Jenkins, under appointment by the Court of Appeal, for Defendant and Appellant J.F.

John Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Senior Deputy County Counsel for Plaintiff and Respondent.

_____

Mother Natalie A. and father J.F. appeal from the juvenile court's jurisdictional and dispositional orders concerning their son Jonathan F. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

J.F. called 911 on October 27, 2011, when five month-old Jonathan F. had difficulty breathing. Jonathan F. was rushed to the hospital, where he was diagnosed with a subdural hematoma requiring emergency surgery. Surgeons found a possible older head injury. Jonathan F. displayed no trauma to the outside of his body.

Jonathan F. had been in the care of his maternal grandmother while Natalie A. was in school the day before his hospitalization, but Natalie A. had picked him up from her mother's home while it was still light out. They arrived home at nightfall: it was "a little bit dark." J.F. and Natalie A. then were alone with Jonathan F. all night. On the morning of the hospitalization, Natalie A. left for school and J.F. was caring for Jonathan F. for the first time by himself. At about 9:00 a.m. Jonathan F. awoke; J.F. fed him, changed his diaper, and played with him. Jonathan F. fell asleep at approximately 9:30 a.m., but J.F. observed that he was gasping for air. J.F. watched Jonathan F. for ten minutes and tried to rouse him, but he did not open his eyes. Jonathan F.'s face began to turn red, and the top of his forehead was changing colors. J.F. called Natalie A., who instructed him to call 911. J.F. denied that Jonathan F. had fallen from any surface or bumped his head. He denied shaking or mistreating Jonathan F.

Natalie A. reported that she did not know what happened to Jonathan. She told DCFS that when Jonathan was born he had swelling on one side of his head, but the pediatrician assured her that it was not of concern. She denied mistreating or shaking Jonathan F., and denied that he had fallen or bumped his head.

Maternal grandmother Yolanda L. babysat Jonathan F. while Natalie A. was in school. On school days Natalie A. would drop off Jonathan F. around 6:30 in the morning and pick him up at approximately 4:00 p.m. She had never witnessed Jonathan F.'s parents mistreating him. She denied shaking the baby or that he had fallen or hit his head.

2

Over the next few days, Jonathan F. began having seizures and was unable to move the left side of his body. He was found to have an acute right subdural hematoma, a subarachnoid hemorrhage, bilateral brain ischemia, and retinal hemorrhages in his left eye. The treating medical professionals suspected the injuries were inflicted rather than accidental. The Department of Children and Family Services (DCFS) filed a petition alleging that Jonathan F. came within the jurisdiction of the juvenile court under Welfare and Institutions Code[1] section 300, subdivisions (a), (b), and (e).

Jonathan F. remained hospitalized or at a rehabilitation center until late December 2011. It was believed that in addition to his traumatic brain injury, Jonathan F. was blind, had mild paresis on his left side, and was experiencing cognitive and motor delays. Further evaluation by an ophthalmologist revealed reason to believe he had some vision on his left side.

In January 2012, when the social worker attempted to explain to Natalie A. the physical issues Jonathan F. faced due to the brain injury he had sustained, Natalie A. responded that Jonathan F. was fine and that there was nothing wrong with him, and maintained that nothing had happened to him. Natalie A. and J.F. visited Jonathan F. regularly and were attentive and caring. In March 2012, the parents completed training on dealing with medically fragile children.

From April through June 2012, the court conducted a contested adjudication hearing at which multiple witnesses testified as to the cause of Jonathan F.'s injuries. Astrid Heger, M.D., the Executive Director and Medical Director of the Child Intervention Program and the Child Abuse Program at the University of Southern California, was a consulting physician on Jonathan F.'s case while he was hospitalized. Heger concluded that when Jonathan F. was brought to the hospital, he had suffered a recent serious, significant intracranial injury most consistent with an acceleration-deceleration type of action. While Jonathan F. did not have fractures, bruising, or neck injuries, there was no constellation of medical conditions or accidental injuries that would

---

[1] All further statutory references are to the Welfare and Institutions Code.

3

have resulted in a child presenting as Jonathan F. did. The fact that Jonathan F.'s retinal hemorrhages were on one side rather than bilateral did not affect her opinion as to the cause of his injuries, as only 40 percent of children suffering from nonaccidental head trauma have bilateral retinal hemorrhages. The injury had occurred within hours to a day before his hospitalization. The emergency brain surgery was necessary to save his life.

Heger was examined concerning possible alternative causes for Jonathan's condition that had been advanced by the mother's expert witnesses. Heger testified that there were no facts in Jonathan F.'s evaluation, examination, or presentation that would indicate that he had any vascular abnormality. His presentation was inconsistent with PHACE syndrome or any other vascular syndrome. His laboratory test results indicated no blood coagulation disorder. The idea that the acute subdural hematoma was actually a recurrence of bleeding from a prior trauma was inconsistent with Jonathan F.'s conditions, as rebleeds from prior trauma are usually very small and asymptomatic; they do not cause apnea and massive subdural hematomas. Jonathan F. did not display a vitamin K deficiency; his bleeding studies were normal, he did not have liver disease, and he had received vitamin K at birth, so his condition was not consistent with a vitamin K deficiency. Jonathan F. presented with no infections that could have caused his injuries. He had no facial hemangiomas, only a birthmark or simple nevus on his face, commonly called an "angel kiss" or "salmon patch." A salmon patch is a faint, pinkish-red mark on the forehead or the back of the neck; the vascular component is under the skin, and it is not raised. A hemangioma, in contrast, is a very purple-red mark, on the surface of the skin; it is raised, disfiguring, and does not fade over time. Had the mark on Jonathan F.'s face been a hemangioma this would have been noted in Jonathan F.'s medical records and further medical evaluation would have been performed.

Parham Yashar, M.D., the neurosurgeon who supervised the surgery on Jonathan F., also testified. During the craniotomy and evacuation, he saw a thin membrane overlying the hematoma, which is suggestive of a previous subdural hematoma. He saw no evidence of arterial-venous malformations in Jonathan F.'s brain. Yashar saw no sign of a hemangioma on Jonathan F.'s face or scalp. Based on his

4

observations and knowledge, he concluded that the acute subdural hematoma was caused by trauma in recent hours or the immediately preceding day or two.

Natalie A. called Mohammed Ali Al-Bayati, a pathologist and toxicologist, to testify. Al-Bayati, a scientist, did not examine Jonathan F., and he did not have a doctorate in medicine. He did not review Jonathan F.'s tests, only the interpretive reports. Al-Bayati opined that the likely causes of Jonathan F.'s respiratory distress were infection, hypoxia, metabolic acidosis, and bleeding. His intracranial bleeding and brain ischemia were caused by a vitamin K deficiency, septicemia, and disseminated intravascular coagulation. Al-Bayati testified that the child had a blood clot that traveled to the brain, blocked the artery that supplied blood to the brain, and caused the brain to bleed. Although Al-Bayati cited other cases where bacterial infections had caused brain bleeds, he conceded that those findings were not similar to Jonathan F.'s case. Al-Bayati believed that Jonathan F.'s immune system had previously been compromised due to allergic reactions to vaccinations. Al-Bayati had evaluated more than 80 cases of possible shaken baby syndrome; in none of those cases did he conclude that the child had been shaken.

Charles Niesen, M.D., a neurologist who testified that he was board certified in child neurology but then admitted that he was not currently board certified in that field, prepared a report in March 2012 about Jonathan F. based on a review of medical records and tests without a physical examination of the child, although he had later examined him. Niesen did not believe that Jonathan F. had suffered abusive head trauma: While his hematoma was the kind of injury that can be seen in cases of abusive head trauma, Jonathan F. had a very small hematoma and it was not only in the subdural area but in the subarachnoid area as well. Subarachnoid hemorrhages are uncommon in abusive head trauma. Niesen believed that the subdural hematoma happened first, but that the subarachnoid bleeding caused Jonathan F.'s respiratory problems and seizure. The bleed itself was not very large, not large enough to cause pressure effects or change in the appearance of the surface of the brain; violent shaking of a child usually causes more bleeding and pressure effects. Jonathan F. did not have any long bone fractures, which

are one of the "pillars of evidence" for abusive head trauma, and his retinal hemorrhages did not appear until later and were on the opposite side of the head from his hematoma. He had no external bruising or damage to the neck vertebrae.

Niesen believed that a mark on Jonathan F.'s face was a hemangioma, an abnormal formation of blood vessels. He also claimed that Jonathan F. had hemangiomas over both eyelids and on other parts of his body. According to Niesen, this was potentially indicative of PHACE syndrome, and multiple skin hemangiomas are associated with a risk of other vascular malformations inside the body. Niesen opined that Jonathan F. was not subjected to nonaccidental abusive head trauma, because he had no bruising and no fractures, and because there's "a more than reasonable, plausible explanation as to why Jonathan has these intracranial bleeds." Niesen acknowledged that a magnetic resonance angiogram was performed to investigate whether Jonathan F. had blood vessel abnormalities, and that none were found; he maintained that a cerebral angiogram should have been performed instead.

Niesen acknowledged on cross-examination that his report, in which he found that Jonathan F. likely suffers from PHACE syndrome, was drafted without seeing Jonathan F. Niesen also reviewed Al-Bayati's report and found it "an interesting take on the facts" but he could not "see a relationship between his explanation and the bleeding."

The juvenile court issued an extensive written ruling discussing the various witnesses and assessing the testimony. The court appeared to find Al-Bayati's testimony largely incredible: the court observed that several of his conclusions were outside his area of expertise and incompatible with the three other medical witnesses, and that it "defies logic" that Al-Bayati had never identified abuse in any of the dozens of cases on which he had been called on to consult. With respect to Niesen, the court noted its concerns (1) that he had misrepresented his status with respect to board certification and that he was evasive about it; and (2) that he had rendered a diagnosis in the case based on some photographs without seeing Jonathan F., then had to retract that opinion in favor of a different diagnosis later.

6

The court acknowledged that not all the classic factors typically found in a shaken baby case were present: there were no fractures, neck trauma, or bruising, and the retinal hemorrhages were unilateral and not discovered until days after the hospitalization. The court, however, credited Heger's testimony that not all inflicted trauma cases include each of the identified features. The court also observed that with respect to the vascular malformation theory advanced by Niesen, the scan performed while Jonathan F. was hospitalized to investigate vascular abnormalities found none; the neurosurgeon supervising the craniotomy and evacuation saw none; and Jonathan F.'s medical records indicated no findings consistent with vascular abnormalities or hemangioma. Ultimately, the court concluded that "the County's evidence is more persuasive. It was not helpful to the court when the evidence presented by the parents' experts appears to contradict each other and undermines the other's findings. The treating physicians' findings and opinions are based upon records, exams, physical observation and testing. Putting a[s]ide Dr. Al-[]Bayati's rather incredible findings, the court notes that although Dr. Niesen's opinions are grounded on his expertise, in medical science and on the medical records in evidence, they [] tend to lean toward the speculative [more] than that provided by the treating physicians."

The court sustained the allegations of the petition under section 300, subdivisions (a) and (e), and entered a removal order under section 361, subdivision (c). The parents appeal.

## DISCUSSION

### I.    Sufficiency of the Evidence

Natalie A. contends that there was insufficient evidence that she had injured Jonathan F. to support the jurisdictional findings under section 300, subdivisions (a) and (e). J.F. contends that there was insufficient evidence to support the finding under section 300, subdivision (e). Each parent joins in the arguments of the other. We review the jurisdictional findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under this standard of review, we examine the whole record in a light most

7

favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses. (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling. (*In re John V*. (1992) 5 Cal.App.4th 1201, 1212.) Substantial evidence supports the jurisdictional findings here.

Section 300, subdivision (a) provides for juvenile court jurisdiction when a child has suffered or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. Section 300, subdivision (e), provides for juvenile court jurisdiction in a child under the age of five years, where the child has suffered severe physical abuse by a parent, or by a person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child. Severe physical abuse includes any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death. (§ 300, subd. (e).)

The evidence is sufficient to support jurisdiction under both provisions. Infant Jonathan F. was subjected to nonaccidental trauma that caused him life-threatening brain injuries. He suffered an acute subdural hematoma and an acute subarachnoid hemorrhage; the hematoma was so large that it interfered with his breathing and necessitated surgery to save his life. The treating physicians, the consulting physician, and the neurosurgeon who supervised his brain surgery all concluded that Jonathan F.'s injuries were inflicted nonaccidentally. Despite numerous examinations and medical tests, no alternative explanation for his injuries was detected by his treating physicians. There was evidence that his injuries were consistent with abusive head trauma and not with alternative conditions advanced by the mother's expert witnesses. Jonathan F. became symptomatic at approximately 9:30 a.m., when he had been in the custody of one or both parents without interruption since before dark the prior late October day. The

8

injuries that required his hospitalization had been inflicted hours to a day before he was hospitalized. Substantial evidence supported the juvenile court's conclusion that Jonathan F. had suffered severe physical harm and abuse at the hands of his parents.

The parents argue that section 300, subdivision (e) does not apply because there is no evidence to support that the parents knew or should have known that Jonathan F. was being abused. The identity of the perpetrator is not required to sustain an allegation under subdivision (e), and circumstantial evidence may support a finding that the parent knew or should have known that the child was being abused. (*In re E.H.* (2003) 108 Cal.App.4th 659, 670.) As Jonathan F.'s symptoms would have been apparent within hours to a day after the nonaccidental head trauma was inflicted; he was in his father's care at the time his symptoms were observed; and he had been in the exclusive care and custody of his parents for approximately 17 hours prior to his display of symptoms, the record supports a conclusion that at least one of the parents harmed Jonathan F. and that the other parent knew or should have known he was being abused.

While Natalie A. contends that there is nothing in the record that "points to *anyone* who may have committed some act of abuse," specifically arguing that she had left the home and that J.F. was caring for Jonathan F. at the time he became symptomatic, Natalie A. and J.F. were Jonathan F.'s sole caregivers for approximately 17 hours before his symptoms appeared. This supports the juvenile court's conclusion that there were two possible perpetrators of the abuse—Jonathan F.'s parents. This long period of care by the parents leading up to the display of symptoms distinguishes this case from *In re Roberto C.* (2012) 209 Cal.App.4th 1241, a case in which a baby became symptomatic while for several hours in the custody of a babysitter, and the babysitter gave inconsistent accounts of what had happened to the child.

Natalie A. argues that the juvenile court "improperly presumed the County doctors' credibility, [footnote] mischaracterized Dr. Niesen's testimony about his certification and rejected Dr. Niesen's findings and analysis on the specious ground that he initially drafted a report without examining the child first (all the while ignoring the fact that the doctor did not do so because he was not afforded the opportunity to conduct

9

an examination), there thus was no reasonable basis for rejecting the testimony of Dr. Niesen. There was likewise no reasonable basis for concluding the County's doctors' theory of causation was correct." None of these assertions are supported by the record. We understand the court's comment that Heger's and Yashar's credibility was "not at issue here" not as a presumption that they were credible but an observation that these two witnesses had not been attacked as inherently incredible, unlike Niesen and Al-Bayati, each of whom faced significant credibility challenges due to particular issues about misrepresentation, bias or lack of objectivity, and issuing arguably premature opinions. The juvenile court did not mischaracterize Niesen's testimony about his certification, for the record supports the conclusion that Niesen misrepresented himself as board certified. The court, moreover, did not reject Niesen's opinion on the ground that he had drafted his report before examining Jonathan F.; the court merely observed that a witness's willingness to diagnose a person with a vascular condition based on a photograph alone and without an examination raises questions of credibility. Finally, the record afforded the juvenile court a reasonable basis both for accepting the opinions of Heger and Yashar and for rejecting Niesen's, a basis that the juvenile court articulated: Heger and Yashar's opinions were "based on records, exams, physical observation and testing," while Niesen's opinion was more speculative. As we defer to the lower court on issues of credibility of the evidence and witnesses, Natalie A.'s complaints about the juvenile court's credibility determinations and weighing of the evidence are unavailing. "When an appellate court reviews a sufficiency of the evidence challenge, we may look only at whether there is any evidence, contradicted or uncontradicted, which would support the trier of fact's conclusion. We must resolve all conflicts in favor of the court's determination, and indulge all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*In re John V.*, *supra*, 5 Cal.App.4th at p. 1212.)

J.F. and Natalie A. allege that the dependency petition's allegations under section 300, subdivision (e) contemplated only that they knew of the abuse and failed to protect Jonathan F. from it, not that they were the instruments of the abuse, and that because

10

there was no evidence that they knew of the abuse and failed to protect him from it, the jurisdictional finding under this provision cannot stand. To the extent this is a challenge to the sufficiency of the factual allegations of the petition, this argument was waived by failing to raise it before the juvenile court. (*In re Christopher C.* (2002) 182 Cal.App.4th 73, 83.) To the extent that the parents contend that the language of the allegation excludes a true finding on this allegation based on a finding that the parents abused Jonathan F., we conclude that the allegation encompasses abuse perpetrated by the parents. The evidence was sufficient to support the court's findings under section 300, subdivisions (a) and (e).

### III.    Removal Order

J.F., joined by Natalie A., argues that there was no basis for removal here. We review removal orders at disposition for substantial evidence, bearing in mind the clear and convincing evidence standard of proof at the juvenile court level. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Substantial evidence supports the removal order.

When a child is adjudicated a dependent child of the court under section 300, subdivision (e), the fact of the adjudication constitutes prima facie evidence that the minor cannot be safely left in the physical custody of the parent or guardian with whom the child resided at the time of injury. (§ 361, subd. (c)(1).) J.F. argues that he overcame the presumption of an unsafe home by presenting evidence that Jonathan F. had been well cared for prior to suffering his injuries; the abuse was isolated; the parents were loving, present, and attentive to him after he was hurt; and, by the time of the dispositional hearing, the parents had completed courses to learn how to provide care for a medically fragile child. Neither parent, however, accepted any responsibility for Jonathan F.'s injuries, nor did they provide any explanation as to anyone else who could have caused them. Months after Jonathan F. was injured, Natalie A. continued to deny that anything had happened or that anything was amiss with him despite the brain injuries having caused him weakness on one side, blindness, and cognitive and motor delays. Natalie A. and J.F. had not engaged in counseling, completed parenting classes, or otherwise

11

demonstrated that they had acquired the skills to prevent physical abuse of Jonathan F. in the future. As the parents failed to demonstrate that they had addressed the issues that led to the severe physical abuse of Jonathan F. while in their care and custody, they did not overcome the presumption of an unsafe home set forth in section 361, subdivision (c)(1). Substantial evidence supported the juvenile court's decision to remove Jonathan F. from the custody of his parents.

## DISPOSITION

The judgment is affirmed.


ZELON, J.

We concur:


PERLUSS, P. J.


WOODS, J.


12