Filed 10/16/13  In re K.C. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re K.C., et al., Persons Coming Under the Juvenile Court Law. | B245941 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>TIFFANY M.,<br><br>　　　Defendant and Respondent. | (Los Angeles County Super. Ct. No. CK46426) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed in part, reversed in part, and remanded with directions.

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Appellant.

Jesse F. Rodriguez, under appointment by the Court of Appeal for Defendant and Respondent.

_____

The Los Angeles County Department of Children and Family Services (DCFS) appeals from the juvenile court's jurisdiction and disposition orders declaring Kd.C. and Kl.C. dependents of the court pursuant to Welfare and Institutions Code[1] section 300, subdivisions (a), (b), (f) and (j), removing them from the custody of their parents, and granting both parents family reunification services. On appeal, the DCFS argues that the juvenile court erred in dismissing a domestic violence count in the dependency petition alleged under section 300, subdivision (a), while sustaining a count based on identical facts alleged under section 300, subdivision (b). The DCFS also asserts that the juvenile court abused its discretion in ordering reunification services for the children's mother, Tiffany M., because there was insufficient evidence to support a finding that reunification was in the children's best interest. We affirm the juvenile court's jurisdiction order, but reverse the portion of the disposition order granting reunification services to Mother and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Juvenile Dependency History[2]

Tiffany M. (Mother) is the mother of nine children, all of whom have been the subject of dependency proceedings: D.H. (a girl born July 2000), E.H. (a girl born June 2001), J.H. (a boy born September 2002), W.M. (a girl born January 2004), K.M. (a boy born March 2005 also known as Baby Boy M.), K.R. (a boy born July 2006), K.L. (a girl born February 2008), and Kd.C. and Kl.C. (twin boys born July 2011). Only the two youngest children, Kd.C. and Kl.C., are the subject of the present appeal.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     These dependency proceedings have been the subject of three prior appeals before this court, resulting in two published opinions and one nonpublished opinion. (*In re E.H.* (2003) 108 Cal.App.4th 659; *In re Baby Boy M.* (2006) 141 Cal.App.4th 588; *In re D.H.* (Dec. 12, 2006, B190055) [nonpub. opn.].) A portion of the factual and procedural background in the present case is taken from these prior opinions.

### A. 2001 Dependency Petition on Behalf of D.H. and E.H.

In September 2001, E.H., then three months old, was admitted to the hospital with multiple fractures to her ribs, wrist, femur, feet, hands, and hip that were at different stages of healing. E.H.'s injuries were consistent with physical abuse and would not ordinarily occur except as a result of neglectful acts or omissions by her caretakers. E.H. had been in the care of both Mother and her father, Jeremy H., at the time of her injuries.

On September 20, 2001, the DCFS filed a section 300 petition on behalf of E.H. and D.H. E.H., who was born with a neurological condition, was detained and placed in a foster home licensed to care for medically fragile children. D.H. was detained and placed with her paternal grandmother, Karen H. On March 25, 2002, the juvenile court sustained the petition in part, declared E.H. and D.H. dependents of the court under section 300, subdivisions (a), (b), and (j), and ordered the children suitably placed.[3]

In September 2002, J.H. was born with cerebral palsy and a neurological condition similar to E.H.'s. Following his birth, J.H. was detained and placed in a foster home based on the DCFS's assessment that he would be at risk if released to Mother. On December 5, 2002, the juvenile court ordered J.H. suitably placed.

On July 29, 2004, the juvenile court granted legal guardianship of D.H., E.H., and J.H. to their paternal grandmother, Karen H. Mother and Jeremy H. were given unmonitored visitation with the children inside Karen H.'s home, and monitored visitation outside the home. However, the case social worker advised Karen H. that, in her professional opinion, Mother should not be allowed to have any unmonitored contact with the children.

---

[3]    In a prior appeal filed by the DCFS, we reversed the juvenile court's order dismissing an allegation in the petition that E.H. was an individual coming within the provisions of section 300, subdivision (e) (child under five who has suffered severe physical abuse). We held that proof of the parent's actual knowledge of the abuse was not required under section 300, subdivision (e), and that jurisdiction was proper where the parent reasonably should have known the abuse was occurring. (*In re E.H.*, *supra*, 108 Cal.App.4th at p. 670.)

### B.     2004 Dependency Petitions on Behalf of D.H., E.H., and W.M., and 2005 Petition on Behalf of Baby Boy M.

In August 2004, Karen H. and Mother brought J.H. to the hospital with head injuries.  He died later that day and was found to have severe bleeding in the brain, possibly due to blunt force trauma, in addition to hemorrhaging, bruising of the eyes, and cardiovascular and respiratory failure.  Although there were several conflicting stories as to what occurred, Karen H. initially claimed that J.H. had fallen out of bed and hit his head.  Based on subsequent interviews with Mother, Karen H., and Jeremy H, it appears the children had spent the weekend before J.H. was admitted to the hospital with Mother.

D.H. and E.H. were immediately removed from Karen H.'s custody and placed in shelter care.  Karen H. was arrested and charged with murder.  In connection with the investigation of J.H's death, the DCFS learned that Mother had given birth to a fourth child, W.M., in January 2004.  W.M. was immediately removed from Mother's custody and also placed in shelter care.  On September 2, 2004, the DCFS filed supplemental petitions on behalf of D.H. and E.H. and a section 300 petition on behalf of W.M.  On November 5, 2004, the juvenile court ordered D.H., E.H., and W.M. placed with their paternal aunt and uncle.  Mother was given monitored visitation with the children.

In March 2005, Mother gave birth to Baby Boy M., and upon release from the hospital, she gave the baby to his biological father, James S., at a train station.  On April 4, 2005, after learning of the birth, the DCFS filed a section 300 petition on behalf of Baby Boy M.  The juvenile court issued a protective custody warrant for Baby Boy M. and an arrest warrant for Mother.  On April 14, 2005, Mother was arrested and brought before the juvenile court, but refused to disclose the whereabouts of the baby.  After concluding that Mother did not know the child's whereabouts, the court purged the contempt proceedings and released Mother from custody.

On June 21, 2005, the juvenile court sustained the petitions as amended as to D.H., E.H., W.M., and Baby Boy M., and declared W.M. and Baby Boy M. dependents of the court under section 300, subdivisions (a), (f), and (j).  The court denied Mother family reunification services as to all four children pursuant to section 361.5, subdivisions (b)(4)

4

and (b)(10) based on findings that Mother had caused the death of another child through abuse or neglect, had failed to reunify with D.H. and E.H., and had not addressed the issues that led to the removal of her children. The court set a permanency planning hearing for D.H., E.H., and W.M., and ordered the protective custody warrant for Baby Boy M. to remain in full force and effect.[4] On March 24, 2006, following a contested hearing, the court terminated Mother's parental rights as to D.H., E.H., and W.M., and ordered adoption of the children as their permanent plan. D.H., E.H., and W.M. were subsequently adopted by their paternal relatives. The whereabouts of Baby Boy M. remained unknown.

### C. 2008 Dependency Petition Filed on Behalf of K.R. and K.L.

Mother gave birth to K.R. in July 2006 and to K.L in February 2008. The DCFS learned of the children's births by contacting local hospitals and obtaining copies of their birth certificates, but could not locate either Mother or the children. On March 14, 2008, the DCFS filed a section 300 petition on behalf of K.R. and K.L. based on the prior severe physical abuse of E.H., the death of J.H., and Mother's failure to reunify with D.H., E.H, and W.M. The juvenile court issued protective custody warrants for K.R. and K.L. and an arrest warrant for Mother. The protective custody warrant for Baby Boy M., who was later identified as K.M., remained in effect. Over the next four and a half years, the DCFS conducted a due diligence search for Mother on a regular basis and followed up on all last known addresses, but was unable to locate Mother or the children.

---

**4** In a prior appeal filed by Mother, we reversed the juvenile court's jurisdiction findings and disposition orders as to Baby Boy M. upon determining that the court should not have proceeded to jurisdiction and disposition hearings for the child prior to locating him. We directed the juvenile court to maintain the protective custody warrant issued for Baby Boy M. in full force and effect and to set the case for periodic review hearings as required by law. (*In re Baby Boy M.*, *supra*, 141 Cal.App.4th at p. 591.)

5

## II.   Initiation of the Current Dependency Proceedings for Kd.C. and Kl.C.

Mother gave birth to twin boys, Kd.C. and Kl.C., in July 2011.  The current matter came to the attention of the DCFS in September 2012 following an incident of domestic violence involving Mother and the father of the twins, Du. C. (Father).  On September 30, 2012, the police responded to a report of domestic violence at a home on Mesa Drive in Lancaster, California.  Mother told the officers that she and Father had been dating for two years and that Father came to her home because he was upset about their break up.  Mother said that Father broke a window at the home as they were arguing and left when she threatened to call the police.  Father told the officers that he came to pick up some clothes and that Mother hit him multiple times on his chest.  He also said that Mother broke a window, picked up a piece of glass, and stabbed him in his chest and his back as he attempted to flee.  Father indicated that he and Mother had other unreported incidents of domestic violence, but could not recall the last occurrence.  The officers observed that Father was covered in blood on his torso and back.  He had a six-inch laceration across his neck, a quarter sized puncture wound to the middle of his chest, and a half-dollar sized puncture wound to the back of his neck.  Father was treated at the scene, but refused to be transported to a hospital or to seek a restraining order against Mother.  Mother was arrested and taken into custody.

On October 4, 2012, Mother appeared before the juvenile court on the warrant for her arrest.  When asked for the location of K.M., K.R., and K.L., Mother testified that she did not know where the children were.  According to Mother, she last saw the children on the day of her arrest at the house on Mesa Drive.  All three children had been living at that address with their maternal aunt, Shirleen M., and were present at the house when Mother was arrested.  Mother did not live with the children, but rather resided with a cousin at an address she could not recall.  It was reported to the court, however, that Shirleen had denied the children lived with her and the DCFS had not found them at that location.  The court found Mother was in contempt for refusing to answer the questions truthfully, and remanded her to the custody of the Los Angeles County Sheriff's Department until she revealed the whereabouts of her children.

6

From October 5, 2012 to October 15, 2012, the juvenile court held a series of contempt hearings to determine the location of Mother's children. Mother remained in custody throughout the proceedings, and continued to testify that she last saw the children at the Mesa Drive house where they had been living with Shirleen for about a year. Mother also stated that the children had been living with Mother before then and that she knew the DCFS had been looking for them since 2008. It was reported to the court that the deputies who had searched the house had not located the children and that Mother's relatives at the house remained uncooperative. The DCFS was able to serve a subpoena on one maternal relative, Shemar M., who lived at that address. When Shemar refused to appear in court pursuant to the subpoena, the court issued a warrant for her arrest.

On October 11, 2012, shortly after Shemar's arrest, K.M. and K.R. were brought to the house on Mesa Drive and detained by the DCFS. During an interview with the children the following day, the DCFS learned that Mother had given birth to twins, Kd.C. and Kl.C., whose whereabouts were unknown. The DCFS also learned that K.L. might be residing with her father, but further investigation was necessary.

On October 15, 2012, Shemar appeared before the juvenile court on the arrest warrant. Shemar testified that K.M., K.R., and K.L. had been living with Mother at the Mesa Drive address for the past year. After Mother's arrest, K.M. and K.R. went to stay with a maternal aunt in Palmdale and K.L. went to stay with her father. Shemar also testified that the twins, Kd.C. and Kl.C., had been living with their father next door to the Mesa Drive house. Following Shemar's testimony, Mother confirmed that K.L. was staying with her father, but stated that she did not have his address and his telephone number was stored in her cell phone. After concluding that Mother had answered the questions about K.L.'s whereabouts truthfully, the juvenile court purged the contempt proceedings and released her from custody with an order to return to court the following day with her cell phone. The children's attorney asked whether Mother was interested in visiting K.R. and K.M. after the hearing, and Mother indicated that she would like a visit. The court responded, "I'm glad to hear that. I'm a little surprised, given the testimony you have given about . . . handing them off to other people to raise them. . . ."

7

Later that day, the DCFS located Kd.C. and Kl.C. at Father's neighboring house on Mesa Drive and detained them. The twins were generally healthy and appeared to be developing appropriately with no signs of physical abuse. Father lived in the house with the paternal grandmother and claimed that the twins had lived with him since their birth. However, in a telephone interview with the DCFS on October 16, 2012, the paternal grandmother explained that she was not aware of Mother's prior involvement with the juvenile court, and only knew that Mother had asked Father to care for the children when she was arrested a week earlier. She also stated that she and Father had some contact with the twins prior to Mother's arrest when Father would babysit them during the day while Mother was at work. The paternal grandmother had been allowing Father to stay at her home because he was having financial struggles, and she was interested in caring for the children if Father was unable to do so.

On October 17, 2012, K.L. was located at her father's home in Lancaster and detained. K.L.'s father indicated to the DCFS that he had been caring for the child since her birth. However, after she was detained, K.L. disclosed to the case social worker that both Mother and her father had instructed her to tell the DCFS that she always lived with her father. K.L. stated that she actually lived with Mother, her siblings, and her maternal aunts and cousins, and that she slept in the same room as Mother and the twins. K.L. also reported that the twins' father had come to their house and broke a window with his fist causing injuries to Mother.

## III. Dependency Petition on Behalf of Kd.C. and Kl.C.

On October 18, 2012, the DCFS filed a section 300 petition on the behalf of the twins. The petition alleged, under section 300, subdivisions (a) and (b), that Mother and Father had a history of engaging in violent physical altercations in the presence of the children, including the September 30, 2012 incident in which Mother repeatedly stabbed Father with broken glass, and that Father had failed to protect the children from Mother's violent conduct. It further alleged, under section 300 subdivisions (a), (b), and (j), that the children's half-sibling, E.H., had suffered severe physical abuse at the age of three

8

months while in Mother's care and custody, and that Mother had failed to participate in court-ordered services and to reunify with the children's half-siblings, D.H., E.H., W.M., and K.M. In addition, the petition alleged, under section 300, subdivisions (f) and (j), that the children's half-sibling, J.H., had died of severe head injuries that were consistent with blunt force trauma and inconsistent with the history provided by Mother, and that the physical abuse of J.H. by Mother had resulted in the child's death. The DCFS also notified the parents in the petition that it might seek an order denying them family reunification services.

At the October 18, 2012 detention hearing, the juvenile court ordered that the twins be detained from both Mother and Father and placed in foster care subject to the DCFS's supervision. The parents were granted monitored visitation at least three times a week. At Father's request, the matter was set for a contested jurisdiction hearing on November 5, 2012.

## IV. Jurisdiction/Disposition Report

For its Jurisdiction/Disposition Report, the DCFS interviewed Mother and Father about the allegations in the petition. In an October 31, 2012 telephone interview, Father stated that the twins had lived with him since birth. He denied any prior knowledge of Mother's history with the juvenile dependency system and felt that he was being unfairly punished for Mother's actions. When asked about the domestic violence incident, Father became very agitated and terminated the telephone call. In a November 2, 2012 in-person interview, Mother reported that both E.H. and J.H. suffered from a medical condition that ran in her family. She denied causing either child's injuries and appeared emotional when the case social worker asked her about the children. With respect to the domestic violence incident, Mother took responsibility for her conduct, stating that she was the offender and Father was the victim. Mother claimed that her three youngest children, K.L., Kd.C., and Kl.C, had been living with their respective fathers since their births, and that prior to her arrest, she had been raising K.M. and K.R. on her own.

9

Mother related that she loved her children, wanted an opportunity to reunify with them, and was willing to comply with her case plan.

In the Jurisdiction/Disposition Report, the DCFS stated that Mother and Father were receiving four hours of weekly monitored visitation with the twins. Both parents had been attending the visits on a consistent basis, and Mother had been cooperative and appropriate during her visits. The DCFS noted that, contrary to the parents' statements, the twins' half-siblings had reported that all of the children were residing with Mother prior to her arrest. Additionally, the paternal grandmother's statements about her and Father's contact with the twins contradicted the parents' claim that the children had been living with Father since their birth. The DCFS recommended that the twins be declared dependents of the court and that the parents' visitation be monitored. The DCFS further recommended that family reunification services be granted to Father, but denied to Mother based on her extensive juvenile dependency history.

## V.    Jurisdiction and Disposition Hearing

A jurisdiction and disposition hearing for the twins was held on November 5, 2012. Without objection, the juvenile court admitted into evidence the reports prepared by the DCFS, and took judicial notice of the contents of its file. Father, Mother, and the case social worker testified at the hearing.

Father testified that the twins had lived with him and the paternal grandmother since their birth. He took the twins home with him from the hospital because he wanted them in his life and Mother agreed to the living arrangement. Mother's only contact with the twins were visits twice a month in a public setting where Father was always present. Father always attended the visits because he was overprotective, but he was unaware of Mother's prior involvement with the DCFS until his children were detained. The twins had never spent the night at Mother's house. Father was the only person who ever took them to the doctor, although he could not identify the doctor's name. Father did part-time construction, recycling, and yard work at night and was also a full-time student. The paternal grandmother worked full time during the day, but took care of the children while

Father was at work or school. When asked where Mother lived, Father initially identified the house on Mesa Drive, but then stated that she did not stay at that address and he did not know where she lived. With respect to the domestic violence incident, Father admitted that Mother physically attacked him with a piece of glass, but denied that he was injured or that the twins were present during the incident. He also denied that he and Mother had any history of domestic violence between them.

Mother testified that the twins were released to Father following their birth and always resided with him. She and Father had agreed before the children were born that they would stay with him. Mother allowed the twins to live with Father because she had an open case with the DCFS and did not want them to be detained. Father only allowed Mother to visit the twins twice a month and never told her why she could not have more time with them. Mother wanted to see the twins more often, but she never asked Father for additional visits because she was busy working, attending school, and caring for her other children. During the domestic violence incident, Mother punched a window and cut Father with a piece of glass, but she was not charged with any crime.

The case social worker testified that K.M., K.R., and K.L. told her that they lived with Mother and the twins prior to being detained. K.L., in particular, said that she lived with Mother, the twins, and her two older siblings, and that they were a "happy family." Father told the case social worker that he was a full-time student and attended school throughout the day. Father also said that the paternal grandmother cared for the children while he was in school. However, the paternal grandmother was employed on a full-time basis during the day and Father never provided an adequate explanation as to where the twins were when he was in school and the grandmother was at work. The case social worker believed Father and Mother may have shared some parenting responsibilities, but did not believe the twins had been residing with Father since their birth.

At the close of the evidence, both counsel for the DCFS and counsel for the children argued that the section 300 petition should be sustained. The children's counsel noted, however, that the domestic violence allegations were more appropriately sustained under subdivision (b) of the statute rather than subdivision (a). The attorneys

11

representing Mother and Father asked that the petition be dismissed and that the twins be released to Father because they were not at substantial risk of harm. The juvenile court found that the parents were not credible in their testimony, and that the twins had not resided with Father since their birth but rather had lived primarily with Mother and several of their half-siblings. The court also found that the twins were at risk of serious physical harm in Mother's care and custody and that Father had failed to protect them from such risk. The court dismissed count a-1 in the petition which was based the parents' history of domestic violence as alleged under section 300, subdivision (a), but sustained all other counts as alleged under subdivisions (a), (b), (f), and (j).

Following the jurisdictional findings, the matter proceeded to disposition without objection from any party. The court asked the parties whether they had any additional evidence as to disposition, but none was offered. Counsel for the DCFS asked the court to grant reunification services to Father, but not to Mother pursuant to section 361.5, subdivisions (b)(4), (b)(10), and (b)(11). The DCFS's counsel also noted that no evidence had been offered to show that reunification services for Mother were in the children's best interest. Counsel for the children joined with the DCFS in requesting that Mother be denied reunification services. The children's counsel acknowledged that she disbelieved Mother's testimony that the twins had not been in her care since their birth, but argued that Mother's lack of forthrightness about their living situation meant that there was no evidence before the court about the nature of her relationship with the children, the length of time they were living together, and the extent to which reunification was in the children's best interest. Counsel for the DCFS and counsel for the children also joined in requesting that the twins be removed from parental custody and suitably placed.

Mother's counsel asked the court to find that reunification services were in the best interest of the twins because Mother had been cooperative with the court, had attended all of the hearings, and was willing to comply with intensive court-ordered services so that she could reunify with the children. Mother's counsel also noted that the twins were very young and would benefit from Mother learning the tools that were

necessary for her to adequately parent them in the future. Counsel for both parents joined in requesting that the twins be released to Father with a protective order in place to ensure that they did not reside with Mother.

With respect to the children's placement, the court found that the DCFS had demonstrated, by clear and convincing evidence, that there was a substantial danger to the twins if they were returned to the custody of either parent, and that there was no reasonable means to protect them without removal. The court declared both children dependents of the court under section 300, subdivisions (a), (b), (f), and (j), and ordered them removed from their parents' custody and suitably placed.

With respect to reunification services, the court noted that the DCFS had the burden of proving, by clear and convincing evidence, that a parent was not entitled to reunification services, and that if such a finding was made, the burden shifted to the parent to prove that reunification was in the children's best interest. The court ordered reunification services for Father, including individual counseling and parenting education. The court also ordered reunification services for Mother, including individual counseling with a licensed therapist, a hands-on parenting education course, a domestic violence program, and a mental health assessment. The court did not make an express finding as to the applicability of any bypass provision of section 361.5, subdivision (b), but did find that reunification with Mother was in the best interest of the children, stating as follows: "I believe that your attention to the children now . . . and that the things that you have told me in previous hearings and now all counsel that it is in the best interest of the children that you have a chance to reunify with these two. It will be for six months. You'll either show amazing, substantial progress in six months, or you're going to lose these children, too. . . . I have to say that I'm impressed that you have continued to return. I put you through a lot, and for a long time in custody, and you came back the next day, just like you said you would. And you've been here every single time since, and that speaks well of you, and I hope a change in your attitude . . . reaffirms your love, affection and desire to reunify with these two children." Following the jurisdiction and disposition orders, the DCFS filed a timely notice of appeal.

13

## VI.    Post-Appeal Proceedings

On May 13, 2013, the juvenile court held a six-month review hearing for Kd.C. and Kl.C.  The court found that continued jurisdiction over the twins was necessary and ordered that they remain suitably placed.  The court further found that Mother was in compliance with her case plan and that Father was in partial compliance with his case plan, and ordered continued reunification services for both Mother and Father.  The matter currently is set for a 12-month review hearing on November 12, 2013.

## DISCUSSION

## I.    Jurisdiction Order Dismissing One Count Under Section 300, Subdivision (a)

On appeal, the DCFS first argues that the juvenile court erred in dismissing count a-1 in the dependency petition which alleged that Kd.C. and Kl.C. came within the jurisdiction of the court under section 300, subdivision (a) based on the history of domestic violence between their parents.  The DCFS reasons that the allegations in count a-1 were identical to the allegations in count b-1 which the juvenile court found to be true, and that jurisdiction under section 300, subdivision (a) is appropriate where a child, through exposure to a parent's domestic violence, is at substantial risk of suffering serious physical harm inflicted non-accidentally by the parent.

"[T]he juvenile court's jurisdiction may rest on a single ground."  (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127; see also § 300 ["[a]ny child who comes within any of the following descriptions is within the jurisdiction of the juvenile court"]; *In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045 ["[s]ection 300, subdivisions (a) through (j), establishes several bases for dependency jurisdiction, any one of which is sufficient to establish jurisdiction"].)  "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by

the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; see also *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"]; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 ["reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds"].)

Here, the juvenile court sustained six of the seven counts that were alleged in the dependency petition, and found that Kd.C. and Kl.C. came within the jurisdiction of the court under section 300, subdivisions (a), (b), (f), and (j). The six sustained counts, which are not challenged by either parent on appeal, provide a sufficient and independent basis for dependency jurisdiction over the children without regard to the one count that was dismissed. Because the juvenile court's uncontested jurisdictional findings were sufficient to support its exercise of jurisdiction in this case, we need not consider whether the court erred in dismissing the single count.

## II. Disposition Order Granting Family Reunification Services to Mother

On appeal, the DCFS also challenges the portion of the juvenile court's disposition order granting Mother family reunification services. The DCFS specifically claims that the juvenile court erred in ordering reunification services for Mother because she was not entitled to services under section 361.5, subdivisions (b)(4), (b)(10), and (b)(11), and she failed to present sufficient evidence to support a finding that reunification was in the children's best interest under section 361.5, subdivision (c).

"'As a general rule, reunification services are offered to parents whose children are removed from their custody in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.]" (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.) When a child is removed from the custody of his or her parent, the juvenile court is required to order family reunification services under section 361.5, subdivision (a) unless the court finds by clear and convincing evidence that

one of the enumerated exceptions in section 361.5, subdivision (b) applies. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 217; *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 95.) These statutory exceptions are often referred to as the "reunification bypass provisions," and "'reflect[ ] the Legislature's desire to provide services to parents only where those services will facilitate the return of children to parental custody.'" (*In re Allison J.*, *supra*, at p. 1112.)

Section 361.5, subdivision (b)(4) allows the court to bypass reunification services where the parent of the child "has caused the death of another child through abuse or neglect." (§ 361.5, subd. (b)(4).) Section 361.5, subdivisions (b)(10) and (b)(11) authorize the denial of reunification services where the parent's prior reunification services or parental rights were terminated over the child's sibling or half sibling, and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child" from the parent. (§ 361.5, subds. (b)(10), (b)(11).) When the prerequisites of these bypass provisions are met, the court "shall not" order reunification services for the parent under section 361.5, subdivision (c) unless it "finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c); see also *In re Ethan N.* (2004) 122 Cal.App.4th 55, 64; *In re Lana S.* (2012) 207 Cal.App.4th 94, 107.) Thus, ""'once it is determined one of the situations outlined in [section 361.5,] subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]"' [Citation.] The burden is on the parent to change that assumption and show that reunification would serve the best interests of the child." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.)

"To determine whether reunification is in the child's best interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity. [Citation.] A best interest finding requires a likelihood reunification services will succeed; in other words, 'some "reasonable basis to conclude" that reunification is possible. . . .' [Citation.]" (*In re Allison J.*, *supra*, 190

16

Cal.App.4th at p. 1116.)  While the court should consider the above-listed factors in its best interest analysis, it is not limited by them.  "The concept of a child's best interest 'is an elusive guideline that belies rigid definition.  Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citation.]" (*In re Ethan N.*, *supra*, 122 Cal.App.4th at p. 66.)  Therefore, additional factors may bear upon the court's determination depending upon the circumstances of the case.

In this case, the DCFS contends that, once the juvenile court made an implied finding that one or more of the bypass provisions of section 361.5, subdivision (b) applied, it could not order reunification services for Mother unless it found, by clear and convincing evidence, that reunification was in the best interest of the children under section 361.5, subdivision (c).  The DCFS argues that the evidence was insufficient to support the juvenile court's order for reunification services for Mother because there was no indication that the court considered the relevant factors in deciding that reunification was in the twins' best interest.  The DCFS further asserts that the record is devoid of any substantial evidence upon which the court could find that the twins or Mother would benefit from reunification services, or that reunification was a reasonable possibility.

In her respondent's brief, Mother does not challenge the DCFS's contention that the evidence was insufficient to support an order for reunification services under section 361.5, subdivision (c).  In particular, Mother concedes that the juvenile court's decision "offers little indication that the court considered some relevant factors in determining whether reunification was in the children's best interest in that [Mother] offered no evidence she had made any effort to resolve the problems that led to the twins' removal and that the evidence indicated she would not benefit from reunification services."  Mother claims, however, that the reason there is no substantial evidence to support a best interest finding is because the juvenile court simply ordered reunification services for Mother without first offering her the opportunity to submit evidence on the issue.  Mother further contends that, if the order for reunification services is reversed, the juvenile court should be directed to hold a new hearing to allow the court to consider the relevant

17

factors in deciding whether reunification is in the twins' best interest and to allow Mother to present evidence to support such an order for services.

Based on the record before us, we agree that the juvenile court's order granting reunification services to Mother was not supported by substantial evidence. First, as both parties recognize, it appears that the juvenile court did not consider the relevant factors in determining that reunification with Mother was in the twins' best interest. As discussed, in making a best interest finding under section 361.5, subdivision (c), the court should consider "the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity." (*In re Allison J.*, *supra*, 190 Cal.App.4th at p. 1116; see also *In re William B.*, *supra*, 163 Cal.App.4th at p. 1228; *In re Ethan N.*, *supra*, 122 Cal.App.4th at pp. 66-67.) Here, the juvenile court found that reunification was in the twins' best interest based on Mother's "attention to the children now," the fact that she "continued to return" to court following her release from custody, and certain unidentified statements made by Mother at the prior hearings. While these particular facts may have had some bearing on Mother' current efforts or fitness, there is nothing in the record to suggest that the court considered any of the other relevant factors in making its best interest finding. Apart from a passing comment that "there seems to have been some horrific circumstances that involved other children," the court did not address the gravity of the problems that led to the prior dependency cases. The court also did not discuss the strength of the bond, if any, between Mother and the twins, and the twins' need for stability and continuity. Additionally, other than noting that Mother's recent attendance at the hearings "speaks well of [her]," the court did not address whether reunification services for Mother were likely to succeed.

Furthermore, even assuming the juvenile court implicitly considered the relevant factors in ordering reunification services for Mother, none of the evidence presented at the jurisdiction and disposition hearing was sufficient to support the court's finding that reunification with Mother was in the twins' best interest. Both Mother and Father maintained throughout the proceedings that the twins had lived with Father since their

18

birth and had only limited contact with Mother. According to the testimony of both parents, the twins only saw Mother twice a month and never for an overnight visit, and Mother never asked Father if she could spend more time with them. As Mother correctly asserts, such testimony did not, in and of itself, preclude the juvenile court from finding that reunification with Mother was in the twins' best interest. Based on the evidence presented by the DCFS, including the statements from the twins' half-siblings and their paternal grandmother, the juvenile court reasonably could find that the parents' testimony was not credible and that the twins primarily resided with Mother prior to their removal.

However, the mere fact that the twins may have spent the first year of their lives in Mother's care was not sufficient to support a finding that reunification was in their best interest. Because of the position adopted by the parents at the jurisdiction and disposition hearing, none of the evidence before the court addressed the true nature and scope of Mother's relationship with the children, the extent of her involvement in their day-to-day care, and the strength of the bond between them. Moreover, as Mother concedes, she offered no evidence to show that she had made a reasonable effort to address the problems that led to the removal of her other children. Instead, the record reflects that Mother had spent the prior four years attempting to hide her children from the DCFS and the juvenile court because she knew they likely would be removed from her care if they were found. The record also reflects that, despite the prior jurisdictional findings, Mother continued to deny any responsibility for J.H.'s death or E.H.'s injuries, and rather claimed that they suffered from a medical condition that ran in her family. Based on this record, the juvenile court's finding that reunification services for Mother was in the twins' best interest was not supported by substantial evidence. The juvenile court accordingly abused its discretion in ordering such services.

The parties dispute what the proper remedy should be for the error. The DCFS argues that the order granting reunification services to Mother should be reversed and the matter should be remanded to the juvenile court with directions to enter a new order denying reunification services to Mother and setting a permanent plan selection hearing under section 366.26. Mother asserts that the matter should be remanded to the juvenile

19

court with directions to a conduct a new disposition hearing on whether reunification is in the twins' best interest because she was denied an opportunity to submit evidence on that issue at the original hearing. Mother's claim that she was precluded from presenting evidence at the disposition hearing, however, is simply not supported by the record.

While we agree with the DCFS that the juvenile court's order for reunification services for Mother must be reversed for insufficient evidence, we cannot ignore the fact that, since the court issued its November 5, 2012 order, Mother has received almost 12 months of services. At the six-month review hearing held in May 2013, the juvenile court found that Mother was in compliance with her case plan and ordered that her reunification services be continued. The 12-month review hearing is currently scheduled for November 12, 2013, at which time the court will decide whether a permanent plan selection hearing should be set for the twins pursuant to section 366.26. Under these circumstances, we conclude that the proper remedy is to remand the matter to the juvenile court to consider at the next review hearing whether, at this stage in the proceedings, Mother should be granted continued reunification services. At that hearing, the juvenile court shall consider the relevant factors set forth in this opinion as well as any additional evidence offered by the parties.

20

## DISPOSITION

The juvenile court's order granting family reunification services to Mother is reversed and the matter is remanded for further proceedings consistent with this opinion. In all other respects, the juvenile court's jurisdiction and disposition orders are affirmed.


ZELON, J.


We concur:



PERLUSS, P. J.



WOODS, J.